Lucille YOUNG, et al., Plaintiffs,

v.

Samuel PIERCE, Jr., et al., Defendants.

Civ. A. No. P–80–8–CA.

United States District Court,
E.D. Texas,
Paris Division.

July 31, 1985.

Michael M. Daniel, Elizabeth K. Julian, Julian & Daniel, P.C., Dallas, Tex., for plaintiffs.

David Deutsch, HUD, Washington, D.C., Charlene Berry, HUD, Ft. Worth, Tex., Steven M. Mason, Asst. U.S. Atty., Tyler, Tex., Robert Wolff, Dept. of Justice, Washington, D.C., for defendants.

## ORDER

JUSTICE, Chief Judge.

Plaintiffs in this class action allege that defendant, the United States Department of Housing and Urban Development ("HUD"), has knowingly maintained, and continues to maintain, a system of racially segregated housing in violation of the Constitution and laws of the United States. Specifically, the plaintiff class asserts that HUD, in funding and overseeing this housing, has discriminated against blacks in violation of the Fifth Amendment to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (prohibiting discrimination in federal programs); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. (prohibiting discrimination in the provision of housing); as well as the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. The plaintiff class consists of all black applicants for, and residents of, HUD-assisted housing in thirty-six East Texas counties ("the class action counties").[1] Defendant HUD is a federal agency which participates in the provision of public housing throughout the nation. Also named as defendants are HUD's Secretary, and the Administrator of HUD's Region VI, which contains the class counties. HUD does not construct, own, or operate any housing itself. Rather, its role is essentially promotional. Through a number of programs, HUD provides significant financial support, technical assistance, and regulatory oversight for the providers of public housing.

In its submissions to the court, HUD has placed these programs under three major rubrics. First, there are "Low-Rent Public Housing Projects Under Management," that is, the public housing created in the Housing Act of 1937, as amended, 42 U.S.C. § 1437. In this program HUD funds directly a local public housing authority ("PHA"), which constructs and operates housing projects. The second category of HUD-assisted housing is denominated "Insured-Assisted Housing." This consists, first, of two programs through which HUD subsidizes mortgage insurance and interest in order to encourage the construction of low-income housing, §§ 221(d)(3) and 236 of Title II of the National Housing Act of 1934, 12 U.S.C. §§ 1715$l$(d)(3) and 1715z–1. The "assisted" aspect of these projects is their receipt of supplemental rental payments from HUD, pursuant to 12 U.S.C. § 1701s. The last program at issue here consists of "Section 8 New Construction" subsidies. This program provides assistance for families occupying new apartments, Section 8 of Housing and Community Development Act of 1974, 42 U.S.C. § 1437f, by making rental payments to landlords. 24 C.F.R. §§ 880–881.

In the class action counties, the three major programs at issue in this litigation can best be understood as representing

---

1. These counties are: Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Delta, Franklin, Gregg, Hardin, Harrison, Henderson, Hopkins, Houston, Jasper, Jefferson, Lamar, Liberty, Marion, Morris, Nacogdoches, Newton, Orange, Panola, Polk, Red River, Rusk, Sabine, San Augustine, Shelby, Smith, Titus, Tyler, Upshur, Van Zandt, and Wood.

periods of HUD activity: until the mid-1960's, HUD created low rent projects almost exclusively; from the late 1960's until the mid-1970's, the chief form of subsidy was "Insured-Assisted Housing"; since the mid-1970's, HUD has mostly been engaged in Section 8 new housing. Charts A–C, Defendants' Motion for Summary Judgment. The Insured-Assisted and Section 8 programs, while administratively distinct, are in many cases mixed in fact. According to HUD, a number of projects have enjoyed both forms of assistance. Memorandum in Support of Defendants' Motion for Summary Judgment at 15.

This action was filed in 1980. The class was certified by this court's order of July 1, 1982. *Young v. Pierce*, 544 F.Supp. 1010 (E.D.Tex.1982). Since that time, the parties have conducted extensive discovery, and have agreed that the issue of liability is ripe for resolution on cross motions for summary judgment. These motions have been extensively briefed, and are accompanied by exhibits and affidavits. Defendants also seek reconsideration of this court's order certifying the class. The question of the class's viability logically precedes that of liability.

### Defendants' Motion to Decertify the Class

Defendants argue that the Supreme Court's decision in *General Telephone Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1981), calls into question the propriety of the class in this action. Defendants further maintain that factual developments since the certification of the class warrant either decertification of the class or its recertification to include a greatly reduced area.

In *Falcon*, the Supreme Court partially invalidated the "across-the-board" Title VII class action certifications which had previously been allowed by the United States Court of Appeals for the Fifth Circuit. Pursuant to the "across-the-board" doctrine, a Title VII plaintiff seeking to represent a class, against which an employer had allegedly discriminated on sexual or racial grounds, was allowed to challenge "across-the-board" all aspects of the employer's discriminatory policy. *Id.* at 154,

102 S.Ct. at 2368, 72 L.Ed.2d 740, *quoted in Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir.), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *see also Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1123, 1124 (5th Cir.1969). In the *Falcon* opinion, the Supreme Court specifically disapproved the inference, allowable under the "across-the-board" doctrine, that an allegation of discrimination against an individual in one area of employment, such as promotions, indicates that the employer has a general policy of discrimination which is manifested in all other aspects of the employer's business, such as hiring, firing, and pay. The *Falcon* Court treated the "across-the-board" doctrine as an impermissible exception to the commonality and typicality requirements of Fed.R.Civ.P. 23, and reaffirmed that "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. at 2372; *see also Vuyanich v. Republic National Bank*, 723 F.2d 1195 (5th Cir. 1984).

Defendants argue that "in *Falcon* the Supreme Court not only rejected the across-the-board rule as applied to Title VII claims in cases such as *Johnson*, it also restated and refined the requirements of Rule 23 as applied to all proposed class actions." Motion to Decertify Class at 4. While it is true that the *Falcon* case restated the requirements of Rule 23—as do many cases dealing with class action certification—, this court is unable to discern any change by the *Falcon* Court of the substantive requirements of Rule 23. *See Carpenter v. Stephen F. Austin State University*, 706 F.2d 608, 616 (5th Cir.1983) ("In [*Falcon*], the Supreme Court holds that proposed class representatives must satisfy each of the Fed.R.Civ.P. 23 requirements, thereby limiting 'the class claims to those fairly encompassed by the named plaintiffs' claims'", *quoted in Falcon*, 457 U.S. at 156, 102 S.Ct. at 2370); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir.1983) (same). The holding in *Falcon* was that shortcuts in fulfilling these requirements

**1042**

are not allowed. The focus of defendants' argument for decertification is that this court, in certifying the class, relied on the shortcut of the "across-the-board" doctrine invalidated in *Falcon*, and that the class in this action does not meet the plain requirements of Rule 23.

In the order certifying the class in this action, the court used the "across-the-board" doctrine as an analogy to the facts here. *Young v. Pierce*, 544 F.Supp. 1010, 1030 (E.D.Tex.1982). The action was not, however, certified as an "across-the-board" action; that doctrine itself has relevance only to employment-related actions under Title VII. The plaintiffs do not seek to challenge HUD's actions "across-the-board." Rather, plaintiffs charge that HUD pays for discrimination, rather than fulfilling its duty to eradicate it, and that this payment is illegal. Defendants vigorously maintain that this allegation challenges their actions "across the board," as it includes numerous different public housing sites and three administratively distinct programs. This objection is largely semantic. HUD actually performs one function: it provides public housing. Obviously, however, such a complicated task requires myriad distinct administrative activities. The plaintiff class here challenges the result of HUD's activity, which, it maintains, is a system of segregated housing. HUD argues that such a result presupposes a large number of derelictions in individual administrative duties (*i.e.*, that a support of a segregated housing system in violation of the Fifth Amendment would necessarily include HUD activities in different programs and places, as well as violations of Titles VI and VIII, and of HUD regulations promulgated thereto) which should be addressed in separate actions. The court considered this argument at length in its order certifying the class. *Id.* at 1024–25, 1030–31. It appears that the plaintiff class is not challenging "across the board" a number of conceptually distinct HUD functions, but rather a single activity which is regulated by a variety of statutes and published guidelines.

Even if this challenge were to be considered "across the board," it should be noted that the *Falcon* case did not entirely rule out class actions of that type. The Court in *Falcon* noted:

> If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making processes. In this regard it is noteworthy that Title VII prohibits discriminatory employment *practices*, not an abstract policy of discrimination.

*Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15 (emphasis in original). Plaintiffs in this action have alleged—and shown—that HUD has maintained a single, uniform policy of knowingly supporting segregated housing in East Texas, in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. §§ 1981 and 1982, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631. The policy of knowingly supporting racially segregated housing prejudices black applicants and residents of public housing—the two component groups in the plaintiff class—at the same time and in the same way; both are illegally required to live in racially segregated housing if they are to benefit from the HUD program.

■ This action fits squarely within either of the first two sentences of the *Falcon* footnote excerpted above. Like a biased employment test, the policy of offering only segregated housing has an impact on both applicants and residents—as opposed to employees. HUD has one chief function as an agency: to offer public housing. The public housing it offers in the class action counties is segregated. Applicants have a choice of white projects

or black projects. Residents live in one or the other. Clearly, both groups suffer from the policy. In a parallel to the second sentence of the footnote, HUD's policy of maintaining segregated housing, unquestionably supported here by significant proof, can fairly be characterized as a general policy of discrimination which manifests itself in a wide range of HUD practices. Plaintiffs have satisfied the commonality requirement of Rule 23(a). This result is unaffected by the holdings in *Falcon* and *Vuyanich.*

■ Defendants also argue that the named plaintiffs are atypical and inadequate representatives because events since the certification of the class have rendered their individual claims moot. The basic premise of this argument is flawed. A class action may proceed despite the mootness of the named plaintiffs' claims. *Sosna v. Iowa,* 419 U.S. 393, 402–03, 95 S.Ct. 553, 558–59, 42 L.Ed.2d 532 (1974); *Moss v. Lane Co.,* 471 F.2d 853, 855 (4th Cir.1973); *cf. East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1976) (error to certify class *after* named plaintiff's claims have become moot). Defendants' contention that the *entire* action is now moot will be treated below, in the discussion of the cross motions for summary judgment.

■ Defendants assert that the named plaintiffs were not typical of the class at the time it was certified, and are less so

now. The court upholds its finding that the named plaintiffs' claims are typical of those of the class they represent. *Young,* 544 F.Supp. at 1031–32.[2] In general, the court finds defendants' strategy of attacking the adequacy of the class representatives, at this stage in the litigation, to be obscure. Rule 23(a) has, in relation to adequacy of the named plaintiffs, a prospective orientation. The question, as framed by subsection (4), is whether "the representative parties *will* fairly and adequately protect the interests of the class." As the findings on the issue of liability in this action indicate, these class representatives have already done so.

### The Motions for Summary Judgment

Both parties have moved for summary judgment on the issue of liability. In addressing these motions, the court must first determine whether there are undisputed material facts sufficient to support judgment. Fed.R.Civ.P. 56(c). The parties have included with their motions extensive administrative records, depositions, interrogatories, and affidavits. In particular, HUD has produced some 105 volumes of records from its Fort Worth and Dallas offices, containing administrative documents relating to PHA's in the class counties.

The information produced by HUD indicates that the public housing sites it funds are segregated by race.[3] Blacks live in one

---

**2.** Defendants argue that facts revealed through discovery have shown the error of this court's original class certification. In support, HUD has advanced a number of minikin allegations against the class representatives. Defendants claim that plaintiff Young is an atypical representative because she was allegedly a poor tenant when she lived in segregated HUD-financed housing prior to February 1976, and because she has allegedly not been vigorous enough in seeking to obtain housing through the PHA local authority since then. These arguments are based on the deposition testimony of Martha Whiteman, Executive Director of the Clarksville Housing Authority, and defendant in *Young v. Whiteman,* No. P–82–37–CA (E.D.Tex.), which was severed from this action in the order certifying the class. Ms. Whiteman's testimony is used to support an attack on plaintiff Beachman, who defendants allege "has a credit problem." (Brief at 21). Finally, defendants claim that plaintiff Jackson is an atypical representative because she declined to be the first black to

move to an all-white project maintained by the Pittsburgh PHA local authority when given a chance to do so in August 1982, while conceding elsewhere that only sixteen of the roughly 2,200 class members offered the chance to be lone pioneers in desegregation have done so. Defendants' Summary Judgment Memorandum at 24. The court is not persuaded that these allegations, if true, tend to show that the named plaintiffs' claims—that HUD has acted to their detriment by offering them only segregated housing—are atypical of those covered by the class. *See generally,* 3B J. Moore, Moore's Federal Practice ¶ 23.06–2 (1985). These plaintiffs were found to be typical representatives of a class of applicants for and residents of HUD-assisted housing in East Texas. The allegations now adduced by defendants as to the plaintiffs' personal qualifications are inadequate to disturb this court's earlier ruling.

**3.** *See infra* Appendix.

set of public housing sites, whites in another. Of 219 sites, made up of low rent sites under management, insured-assisted sites under management, and Section 8 new construction sites under management, 121—more than half—are completely segregated, one-race projects. An additional sixty-two project sites are 85% or more one-race. In many cases the percentage of non-predominate racial group members is comprised of one or two units in an otherwise one-race project site.

In its standard compliance agreement, *see infra* p. 1047, defendant defines a race-predominate site as one in which 75% or more of a site is occupied by one race. *See, e.g.*, Agreement, Volume 41, Fort Worth Office Records, at 55. Using this yardstick, an additional sixteen sites would be added to the list of segregated projects. An additional five sites can be added to this number if black and hispanic residents are treated together. Thus, 199 of the project sites—more than 90%—are either predominately minority or predominately white, with the great majority of these being completely segregated.

The pattern of segregation is as striking if projects are grouped according to the form of support they receive from HUD. A measure of the extent of segregation in HUD-assisted housing is that it is simpler to summarize racial occupancy patterns by giving the percentage of *integrated* facilities. Only eleven, or 7%, of the low rent projects are *not* predominately one race. Of thirty-six insured-assisted projects, four, or 11%, are *not* predominately one-race. Of twenty-two Section 8 new construction projects, five, or 23%, are *not* predominately one race. A close analysis also reveals skewed patterns of participation in these programs. While the races occupy low-rent housing in roughly equal numbers, 77% of all insured-assisted units in the class counties are occupied by blacks. In contrast, 76% of Section 8 new construction units are occupied by whites. Defendants' data also indicates that, in regard to these last two programs, discrimination can be parsed along temporal lines: 84% of projects approved before 1972 are 85 to 100% black. Of those approved after 1972, 48% are 85 to 100% white, 12% are 85 to 100% black, and 39% are at least partially integrated.

The parties agree that there is a rough equivalency of demand for public housing between white and minority groups in the class action counties. According to the 1980 Census, blacks constitute 43% of the persons living below the poverty level in the class action counties, and 66% of those living in housing without plumbing. Chart F, Defendants' Motion for Summary Judgment. The percentage of blacks with incomes below the poverty level for each of the counties in this action is set out in the Appendix.

In conclusion, then, a number of factual conclusions may be drawn from defendants' data: (1) the vast majority of projects are predominately one race; (2) the percentage of one-race sites is highest in the low rent projects; (3) blacks participate disproportionately in older insured-assisted projects; (4) whites participate disproportionately in Section 8 new construction projects;[4] and (5) the races have roughly equivalent needs for public housing.

The extent of HUD's knowledge of and support for this system of segregated housing is sharply disputed by the parties. In the early stages of this litigation, HUD professed ignorance of segregation in public housing, and now alleges that it has learned of its existence only through this action. HUD also argues that segregation exists in public housing only in spite of its vigorous efforts to eradicate it. Plaintiffs allege that HUD has a duty to acquaint itself with its own functionings, has been in fact aware of the racially identifiable nature of the housing it operates, and has continued to fund and operate this housing while knowing it to be segregated. In order to resolve the disputed questions, it is necessary to look at the historical background of the present situation of public housing in East Texas. The court will first set out the facts of the development of the national public housing system, of which the class action counties are a part. Specif-

---

**4.** This court's conclusion of law that HUD does have a duty to know if it is funding discrimina- tion is set out below. *See infra* pp. 1055–1056.

ic facts relevant to HUD's actions in East Texas will then be discussed.

Prior to 1964, public housing was *de jure* segregated. Deposition of Flieller, HUD Director of Housing, Dallas Area Office, at 40–41; Comment, *The Public Housing Administration and Discrimination in Federally Assisted Low Rent Housing,* 64 Mich.L.Rev. 871, 872 n. 4 (1966). These projects were operated according to a Public Housing Administration ("federal PHA") policy of "separate but equal." *Cohen v. Public Housing Administration,* 257 F.2d 73, 74 (5th Cir.1958) (federal PHA regulations required that public housing programs "reflect equitable provisions for eligible families of all races determined on the approximate volume of their respective needs for such housing."). As of 1962, there was only one public housing project in the Southern states having even token integration. R. Covell, Assessment Report by the Office of HUD Program Compliance 2 (December 4, 1981) (Plaintiffs' Summary Judgment Exhibit 58).

In 1962, a nationwide policy against discrimination in federally assisted housing was established by President John F. Kennedy's Executive Order No. 11063, which stated: "The granting of federal assistance for ... housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of the United States as manifested in its Constitution and laws." The federal PHA—HUD's predecessor agency—responded to this order by issuing regulations requiring future contracts with local housing authorities to include an antidiscrimination covenant, but exempting all existing projects from any duty to desegregate. Comment, *supra,* at 878–79. The federal PHA had no policy of tenant selection and assignment aimed at desegregation until 1964. In that year, Title VI of the Civil Rights Act of 1964 was passed, prohibiting racial discrimination in federally funded housing. In response to Title VI, the federal PHA permitted local housing authorities to follow a "Freedom of Choice" policy, allowing prospective tenants to choose a housing site in which they desired to live. *Id.* The only activity engendered by this new policy seems to have been the distribution by the federal PHA of Form PHA–3037, requiring the local provider to acknowledge previous segregation and adopt the freedom of choice plan. *See, e.g.,* Plaintiffs' Summary Judgment Exhibit 66 (1965 example from Jefferson PHA). This new policy had no significant impact nationwide. R. Covell, *supra,* at 4. The record is bereft of any evidence of a single project being desegregated in response to federal PHA pressure before 1964.

In 1965, HUD was established and given responsibility for the federal PHA programs. 42 U.S.C. § 3534(a) (1965); R. Covell, *supra,* at 6. The record contains no indication of HUD activity designed to end segregation between 1965 and 1967. In 1967, HUD promulgated regulations, pursuant to Title VI, instituting a new tenant selection and assignment policy. 24 C.F.R. § 1.4(b)(2)(ii). This policy, which is still in effect, specifies a racially neutral tenant assignment plan "providing for assignment on a community-wide basis in sequence based upon the date and time the application is received, the size or type of unit suitable, and factors affecting preference or priority established by the recipient's regulations, which are not inconsistent with the objectives of Title VI of the Civil Rights Act of 1964." According to the 1981 Assessment Report by the Office of HUD Program Compliance:

> There were some assumptions about race which underlay the adoption of the 1967 policy. It was assumed that in many cities the local housing authorities had black projects with long waiting lists and white projects with no waiting lists at all. It was assumed that offers of units in white projects would overcome the reluctance of blacks to move into such projects, resulting in the desegregation of the previously white projects. The policy was not designed to desegregate black projects....

R. Covell, *supra,* at 6.

In 1967, HUD also issued site-approval rules which prevented HUD approval of

"any proposal to locate housing only in areas of racial concentration." HUD Low-Rent Housing Manual, § 205.1 ¶ 4g (rev. ed. Feb. 1967), *quoted in Shannon v. United States Department of Housing and Urban Development,* 436 F.2d 809, 820 (5th Cir.1970).

These HUD policies were ineffective in remedying past segregation or preventing segregated occupancy in new project sites. This failure was apparent, in regard to the tenant selection plans, as early as 1969. Federal Programs Section, Civil Rights Division, U.S. Department of Justice, Interagency Survey Report Evaluation of Title VI Enforcement at the U.S. Department of Housing and Urban Development 38 (September 1977) (Plaintiffs' Summary Judgment Exhibit 6) (hereinafter cited as Interagency Survey). In November 1972, HUD's Office of General Counsel wrote that the existing tenant selection and assignment policy was "difficult to enforce and of dubious value" and proposed a new plan. Letter from David O. Maxwell, General Counsel, HUD, to David L. Norman, Assistant Attorney General, Civil Rights Division, Department of Justice (November 15, 1972), *quoted in Interagency Survey, supra.*

In 1972, HUD promulgated regulations implementing Title VIII of the Civil Rights Act of 1968, which governed site selection and marketing for HUD projects. 24 C.F.R. §§ 200.600, 200.700. These regulations are prospective and use explicit racial classifications, in contrast to the tenant selection and assignment plans. The thrust of the 1972 regulations is to prohibit construction of new public housing projects in areas of minority concentration, and to require developers in other areas to follow an Affirmative Fair Housing Marketing Plan ("Fair Housing Plan"). *See* Maxwell, *HUD's Project Selection Criteria—A Cure for "Impermissible Color Blindness"?,* 48 Notre Dame Law. 92 (1972).

In practice, each applicant under the 1972 regulations begins the process of requesting federal funding by proposing a project site to HUD. HUD rates the site according to the eight criteria set out in 24 C.F.R. § 200.710: an area of minority concentration is rated "poor," a mixed area is "adequate," and one of nonminority concentration is rated "superior." A poor rating on any of the criteria results in disapproval. HUD's actions in consistently refusing to fund housing in minority areas is balanced, in principle, by efforts to market new public housing to minority group members. HUD's Fair Housing Plan Handbook states that

[t]he program indicated by the Plan should include efforts to reach those persons who traditionally would not have been expected to apply for the housing. For housing located in predominately white areas, it will normally be necessary to make special efforts to make its availability known to minorities; similarly, for housing in areas of minority concentration, special efforts may be needed to make its availability known to whites.

Handbook for Implementation of Affirmative Fair Housing Marketing Regulations 3 (June 1973) (Plaintiffs' Summary Judgment Exhibit 21) (hereinafter cited as Handbook). The Handbook goes on to state that the Equal Opportunity Staff will conduct compliance reviews of the Fair Housing Plan throughout the life of the HUD mortgage. *Id.* at 5. As the then General Counsel of HUD succinctly wrote at the time these regulations were promulgated, "Clearly, the availability of low—and moderate—income housing outside an area of minority concentration means nothing to residents of that area who never learn of it." Maxwell, *supra,* at 101.

Data supplied by HUD indicates that it began to process applications for Section 8 New Construction projects in 1977. These projects are subject to site selection and marketing regulations which parallel those of 1972 (relating to rent supplement and insured-assisted projects). The site selection standards provide:

(c) the site must not be located in:

(1) An area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority fami-

lies, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area.... or

(2) A racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area.

24 C.F.R. § 880.206. The Fair Housing Plan standards for Section 8 New Construction are the same as for other HUD projects. 24 C.F.R. § 880.601(a). Proposed projects must set out plans for reaching minorities (if the project is in a predominately white neighborhood) and must state an expected racial occupancy which will be achieved through the plan. HUD then has a duty to monitor the fulfillment of the plan, and refer instances of non-compliance with the plan to the HUD Regional Administrator for Equal Opportunity. Handbook, *supra*, at 4. While these regulations do not hold HUD to any percentage of minority occupation, they clearly charge the agency with, at the very least, *knowing* the proposed and actual racial mixture.

The 1977 Interagency Survey of HUD Title VI enforcement activities, conducted by the Civil Rights Division of the Department of Justice, pointed out numerous deficiencies in HUD's nationwide performance of its duties to prevent and remedy segregation in public housing. The report found that HUD had failed to develop an effective Title VI review program, that it had failed to remedy possible civil rights violations in a timely manner, and that the existing system of tenant assignment was ineffective in remedying segregation. The survey recommended that HUD develop a new, effective plan. Interagency Survey, *supra*. HUD agreed to do so. Memorandum of Understanding Between the Department of Housing and Urban Development and the Civil Rights Division, Department of Justice, Regarding the Enforcement of Title VI of the Civil Rights Act of 1964 (1979) (Plaintiffs' Summary Judgment

Exhibit 7). HUD has made no change in its tenant selection policies as a result of this agreement, however. Deposition of John Knapp, General Counsel, HUD, at 49.

If a HUD-sponsored project is found to be in violation of Title VI, HUD's response is today what it was in 1975: the offending owner or PHA is required to enter into a compliance agreement, ostensibly designed to eliminate racial segregation. Under this plan, an applicant is first offered units in projects where their race does not predominate. If no units are available at these sites, then the applicant will be offered units at sites where his or her race does predominate. An applicant may choose to postpone making a unit choice without losing his or her place on the waiting list for public housing. However, if applicants refuse all units in projects where their race does not predominate, they are moved to the bottom of the waiting list. Compliance and Enforcement Procedure for Title VI of the Civil Rights Act of 1964, Model Compliance Plan, Appendix 4.5 (June 1976) (Plaintiffs' Summary Judgment Exhibit 57). Adoption of such a compliance agreement serves to administratively clear HUD's finding of Title VI non-compliance. *See* Affidavit of John Eubanks, HUD's Acting Regional Director of Fair Housing and Equal Opportunity, at 15 (June 1983) (Plaintiffs' Summary Judgment Exhibit 16).

### Public Housing in East Texas

The result of HUD's involvement in the provision of East Texas housing—that is, a system of segregated housing—has been set out above and in the Appendix to this order. The history of public housing in the class action counties is simply that of HUD allowing PHA's to construct segregated housing projects and selectively enforcing its regulations in a way calculated to insure that these projects remained segregated.

It appears from information in the administrative record that, at the time HUD was created, there were thirty-two public housing authorities in the class action counties, twenty-seven of which operated historically segregated projects, and four of

which provided housing for whites only. In the period between 1966 and 1969, eighteen new public authorities opened in the class action counties. Of these, thirteen were segregated from the beginning, and three were all white. Also during this period, large numbers of HUD insured-assisted rental housing units were constructed in East Texas which were overwhelmingly black. Between 1970 and 1974, it appears that eight new public housing authorities were formed in the class counties. Five of these were exclusively white, and two were segregated.

Starting in 1977, HUD approved and funded large numbers of Section 8 New Construction projects. HUD consistently enforced the site-selection criteria prohibiting construction in minority areas. *See* 24 C.F.R. § 880.206(c). Every HUD-approved Section 8 New Construction project in East Texas is in what HUD defines as a white neighborhood. Defendants' Summary Judgment Memorandum at 18–19, 30–34.

While HUD vigorously enforced the site-selection regulations governing Section 8 New Construction, it appears to have abdicated altogether its duty to enforce the Fair Housing Plan regulations which theoretically make this housing available to minorities. A review of the documents submitted by HUD indicates that HUD approved three projects which did not submit any Fair Housing Plan (Raintree Tower and Northridge Manor in Beaumont; Pine Lakes Estate in Nacogdoches). Two projects were approved which submitted Fair Housing Plan's calling for no expected occupancy by blacks. For those projects which did submit plans, there is no apparent relationship between estimated need for housing by blacks and the proposed percentage of black occupants in the Fair Housing Plan. In most cases, the proposed figure is about half of need, as reflected in the percentage of blacks in surrounding areas with incomes below the poverty level. Additionally, HUD appears to have ignored totally its responsibility to monitor the results of the Fair Housing Plans. Only half of the Section 8 New Construction projects

submitted reports at all. These reports were in each instance late. The reports indicate that few projects actually fulfilled their professed goals of minority participation. HUD appears to have done nothing to review or monitor the initial occupancy process. As a result, those projects which did tardily submit their occupancy reports presented HUD with a *fait accompli*, generally consisting of an all-white or mostly white project.

The administrative record submitted by HUD contains numerous and compelling indications that HUD was actually aware of the segregated nature of the housing it had created and continued to fund. HUD's own findings, made before the filing of this action, revealed that at least twenty of the public housing authorities in the class action counties were operating in violation of Title VI. For example, a 1977 occupancy audit of the Avery PHA found that it was not using the Methods of Administration (MOA) promulgated by HUD under Title VI, and that it kept no records of applications, rejections, or tenant files. The Avery PHA's one site was at that time and, according to HUD's most recent data, is still completely white.

In 1967 a HUD Regional Fair Housing Equal Opportunity Officer noted in a report that strictly segregated sites were being maintained in Corrigan through a "freedom of choice" tenant assignment plan. HUD reviewed this same PHA in 1978, and found that it was again not following HUD's regulation on the tenant selection process. The Corrigan PHA has three all-black sites, one all-white site, and one site that is 73% white.

The Diboll PHA's occupancy reports filed with HUD between 1975 and 1979 show a consistent pattern of separate black and white race-predominate projects. Two of the Authority's five projects are now segregated.

In 1971, HUD received a complaint about the Edgewood PHA's allegedly discriminatory policies, and found that the PHA had used a "freedom of choice" tenant assignment system at initial occupation which

resulted in "racial concentrations." The letter to the PHA stated that "[s]uch a situation is in violation of the objectives of Title VI of the 1964 Civil Rights Act as well as your tenant assignment plan." The Edgewood PHA now maintains three all-black sites and an integrated site.

A 1974 Occupancy Report found that the Garrison PHA was not maintaining a waiting list, as required in the tenant assignment plan. In 1978, another report revealed that the PHA was maintaining *separate* waiting lists, one for each segregated site. The report states, "This is totally against all [f]ederal [r]ules and [r]egulations." The Garrison PHA now maintains two sites. One is all black; the other, all white.

A 1978 inspection report by a HUD officer refers to the Ward PHA's three sites by race, and explicitly sets forth their racial composition. According to HUD data, the PHA operates one all-black site, one all-white site, and one site which is now 75% black.

A 1979 occupancy audit found that the Gilmer PHA was in violation of Title VI in that it maintained separate waiting lists by race and color. The Executive Director of the PHA replied to HUD,

I guess the reason we can't get our projects together on race is because when these projects were built there was no such thing as discrimination. One project was built for Minority and the other one for Non-Minority groups. It seems that is the way they still want it.

The Gilmer PHA maintains one all-black site and one all-white site.

The Hemphill PHA operates two sites. One is 100% white; one is 78% black. A 1978 occupancy audit by HUD revealed that the PHA was not using a waiting list for assigning tenants, as required by HUD regulations.

A 1979 occupancy audit of the Kirbyville PHA revealed a "totally inadequate" system of processing applications, the complete lack of a waiting list, and failure by the PHA to file required reports with HUD. The PHA's three sites are currently 100% white, 100% black and 94% black.

The Linden PHA maintains an all-white site and an all-black site. A 1974 audit found that the PHA was not using a waiting list, and that Title VI reports had not been made.

The Malakoff PHA likewise has two sites, each completely segregated by race. A 1976 audit noted, "We inquired about [the segregated sites] and the [Executive Director] explained that there was absolutely no discrimination involved. He said offers were made to tenants at both locations, but in the end it has been a matter of choice as to where the applicants want to live."

In 1973, HUD found that the Mt. Pleasant PHA was using a credit check requirement to discriminate against blacks, and that as a result black occupancy was less than half of the amount—roughly 30%—indicated by the percentage of low income blacks in the area. It also found that the PHA was not following basic tenant assignment procedures. The PHA's two sites were 95% white and 68% white in 1982.

The Omaha PHA maintains eight sites. In 1975, a HUD occupancy audit found:

The application process was generally in order (some changes recommended) and the Executive Director appears to be proceeding with minimal or no bias. The project sites are segregated but the sites with greatest numbers of blacks and whites immediately adjoin one another, resulting in blacks and whites living on the same street but not totally integrated. Executive Director says this is by choice and that she will not hesitate to totally integrate when that choice is made [5] even though she feels it will run off many whites. [The HUD Auditor] recommended that she continue to follow the adopted [Methods of Administration].

HUD's most recent data indicates that four of the PHA's sites are all-black, one is 90% black, and three are all-white.

---

**5.** According to HUD's latest data, that "choice" has still not been made.

The Orange County's five sites contain no blacks. A 1979 occupancy audit found "no history of a single Black family ever applying at this Authority." It recommended that "[e]fforts should be made to house *all* low income families in the county. Eligible Black families might be found and made aware of the authority's available housing by contacting Black groups and churches in the area."

The Paris PHA has four sites, one all-white, one 97% white, one all-black, and one 87% black. A 1974 occupancy audit revealed that this segregation—which was complete at the time—had resulted from use of a "freedom of choice" policy in tenant assignment. The PHA was instructed to report any Title VI complaints to HUD in the future, and to post required notices on bulletin boards in the PHA office foyer.

A 1968 occupancy audit of the Pittsburg PHA revealed that "[r]equired methods of administration pursuant to Title VI of the Civil Rights Act of 1964 ha[d] not been adopted." The PHA's two sites were completely segregated when this action was filed.

The Talco PHA operates one all-white site. In 1970, a HUD auditor visited the project. At that time, the PHA was seeking funding for a new site. The auditor wrote that:

> [The PHA chairman] was anxious to discuss the requirements of Title VI and most of all what happens to [a] project in development if the Authority is found not in compliance with the [Methods of Administration]. I told [him] I had seen some projects stopped. All this was brought up because of a young Negro man who was next in line for a unit in the present project. According to [the chairman], the Authority may lose some white tenants, if Negro families move in. I strongly emphasized to both [the chairman] and [the executive officer] that the Authority must comply with its adopted

plan. Thus, this young man should be offered a unit.

An occupancy audit of the same PHA in 1978 revealed that it still had not adopted HUD's required methods of administration. In addition, the Executive Director was quoted as saying "there were no blacks in the project, [he] did not want them, and if there was a vacancy available, a white person would be put in right now."

A 1974 Title VI compliance review of the Texarkana, Texas, PHA [6] states that the Authority was not using the tenant selection procedures set out in HUD regulations. In 1975 another investigation was conducted. Because the Authority had adopted the required regulations, it was found to be in compliance with Title VI. The second report indicates, however, that four of the Authorities six projects are segregated, even though a high number of units were vacant due to modernization. According to the latest data supplied by HUD, the PHA now operates eleven sites. Three are predominately black, five are predominately white, and three are integrated.

The Trinidad PHA operates four projects. Two are all-white, one is 83% white, and one is all-black. Of the thirty units in these projects set aside for the elderly, all are occupied by whites. A recent HUD Title VI review indicated that blacks initially occupied one site. Subsequently, *all* blacks were "prohibited from occupancy" to make room for white elderly tenants. During this period, evidently, a HUD auditor visited the PHA. His 1974 report states that no blacks reside in the PHA's sites, and that "[n]o indication of discrimination [was] noted."

In 1974, a HUD Title VI compliance review of the Crockett PHA showed that it was not using one of the approved tenant assignment plans. A 1978 report shows the same, and notes that the PHA operates five completely segregated sites. After this finding, the PHA entered into a volun-

**6.** *See Clients Council v. Pierce,* 711 F.2d 1406 (8th Cir.1983) (discussing segregation in Texar-kana, Arkansas PHA).

tary compliance agreement which required that the PHA submit occupancy reports to HUD, over a period of two years, showing its efforts to bring its conduct into line with Title VI. These reports indicated that, while whites were occasionally offered an opportunity to live in all-black sites, no black was ever offered an apartment at the white site. The result of HUD's enforcement activity in 1982 was one all-white project, two all-black projects, a 98% black project, and an 88% black project.

Also in 1974, the HUD Dallas Area Office circulated a memorandum addressed "TO ALL PUBLIC HOUSING AUTHORITIES." Volume 42, Fort Worth Office Records, at 34. This memorandum states that the Dallas Area Office, in its review of East Texas projects, found "numerous cases of non-compliance in implementing the Tenant Selection and Assignment Plans."

In each instance set out above, HUD had direct knowledge, reflected in its own administrative records, that conditions in violation of Title VI existed in the class action counties. Typically, the violations were in the crucial—for the purpose of racial make-up at sites—area of tenant assignment. HUD received, at the very least, indications that twenty of the PHA authorities in the class counties were circumventing HUD regulations and assigning tenants in ways producing segregation. At the most, HUD's response consisted of adoption of a remedial plan. Usually, PHA's were simply admonished to bring their conduct into line with HUD regulations. As long as the proper documents were adopted, and reports filed, HUD approved the PHA's actions.

Deposition testimony by the HUD officials responsible for Title VI enforcement in the class action counties indicate that PHA's were free to maintain overtly segregated sites if they followed HUD's guidelines in doing so. Deposition of Peter T. Hinojosa, FHEO Director of Dallas Office, and Earnie F. Wilkerson, Equal Opportuni-

ty Specialist, 5–7; Deposition of Irving Statman, Manager of Dallas HUD office, 24, 25; Deposition of Leonard Chaires, Regional FHEO Administrator, 55. Similarly, these officials maintain that HUD has no power or duty to remedy the effects of past discrimination, *id.* at 124–125; Deposition of John Eubanks, Compliance Director of FHEO Administrator, 23–24. As Eubanks succinctly stated in relation to PHA's that were found to maintain segregated housing: "I think it is best we'd have something to propose to them. But to require them to *do* something, would, in my judgment, be beyond our scope." *Id.* at 24 (emphasis added). *Each* of the PHA's found in violation of Title VI in the 1960's and 1970's is still maintaining segregated sites. Perhaps most significantly, the flow of public dollars funding these illegally segregated PHA's has in each case continued uninterrupted.

The above discussion sets out the undisputed facts of HUD's involvement in the creation of the existing system of public housing in East Texas. The results of that involvement are undisputed: a system of segregation. Defendants argue, however, that their actions since this cause was filed have rendered the controversy between them and the plaintiffs moot.

In the interval since this action was filed, HUD has conducted an administrative review of every public housing authority in the class counties. In each case where a public housing agency has been found in violation of Title VI, it has been required by HUD to sign a voluntary compliance agreement. *See supra* pp. 20–21. Since this court's approval of the parties' proposed transfer plan in *Young v. Whiteman,* No. P–82–37–CA (E.D.Tex. November 25, 1983), HUD has taken further measures. The General Counsel of HUD, John Knapp, has submitted an affidavit outlining these steps. Knapp states that HUD has created a task force to address the problem, and has called a meeting of public housing authority directors from the class counties. Each PHA which has been found to be in violation of Title VI and which

appears to have over-housed tenants[7] is, according to Knapp, required to submit a plan for transferring these tenants to appropriately sized units. It is hoped that this step, referred to by Knapp as "Phase I," will lead to desegregation. HUD has not yet evaluated the effectiveness of this program in the class action counties. After each PHA has completed its Phase I efforts, Knapp states that it will then be required to submit a Phase II plan, outlining what the PHA sees as further steps to be taken toward desegregation.

*Plaintiffs' Fifth Amendment Claim*

■■■ HUD has intentionally and knowingly continued to promote purposefully segregated housing in the class action counties. It is beyond dispute that the Constitution prohibits the government from funding racial discrimination with the public dollar. Indeed, *any* tangible assistance to segregation is prohibited if it has a "significant tendency to facilitate, reinforce, and support private discrimination." *Norwood v. Harrison*, 413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973); *see also Washington v. Seattle School District*, 458 U.S. 457, 485, 102 S.Ct. 3187, 3202, 73 L.Ed.2d 896 (1981); *Gilmore v. City of Montgomery*, 417 U.S. 556, 573–74, 94 S.Ct. 2416, 2426, 41 L.Ed.2d 304 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 721–722, 81 S.Ct. 856, 859–60, 6 L.Ed.2d 45 (1961); *Cooper v. Aaron*, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1959) ("State support of segregated schools through any arrangement, management, funds or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws."); *National Black Police Association v. Velde*, 712 F.2d 569, 581 (D.C.Cir.1983); *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir.1971) (federal funding of segregated housing program violates due process); *Green v. Connally*, 330 F.Supp. 1150, 1164–65 (D.D.C.) ("Clearly the Federal Government could not under the Constitution give direct financial aid to [institutions] practicing racial discrimination."), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). *But see Bob Jones University v. United States*, 461 U.S. 574, 579 n. 4, 103 S.Ct. 2017, 2022 n. 4, 76 L.Ed.2d 157 (1983) (Rehnquist, J., dissenting) (state support of discrimination should be insufficient to constitute liability unless coupled with showing of discriminatory intent). HUD's funding, regulation and assistance of local PHA's is clearly unconstitutional support of segregation within the meaning of these cases.

■■■ Defendant argues that its relationship with public housing is too attenuated to give rise to liability.[8] In *Velde*, the Court of Appeals for the D.C. Circuit held that "[a]lthough some forms of government involvement are sufficiently indirect and complex that they require a careful balancing of factors, the constitutional prohibition on intentional discrimination clearly prohibits the government from funding other agencies engaged in such practices." *Velde*, 712 F.2d at 582. While it seems intuitively obvious that the combination of federal funding, technical assistance, and regulatory oversight of segregation would constitute sufficient involvement to give rise to liability, *see Cooper*, 358 U.S. at 19, 78 S.Ct. at 1410, HUD draws support for its argument to the contrary from two re-

---

7. Segregation often leads to "over housing." In the typical case, "a white elderly family or individual is placed in a unit for which the more appropriate applicant would be a larger family where the only such large family applicants on the waiting list were black." Knapp Affidavit at 12.

8. While defendant argues that there is simply no federal action in the providing of public housing in East Texas, it also concedes that it has a duty to desegregate this housing, and argues that this entire action is moot because of HUD's successful desegregation actions. These arguments are, obviously, inconsistent in their premises: lack of federal action suggests that HUD's relationship is too attenuated for liability vis-à-vis claims that defendants' action has made it moot.

cent Supreme Court cases, *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). In these opinions, the Supreme Court discussed the circumstances under which the action of a recipient of federal or state funds can be challenged as "state action."

In *Blum,* a class of hospital patients sought to bring suit against the Commissioners of the New York Department of Social Services and the Department of Health. The plaintiff class alleged that these state agencies responded to the medical placement decisions of private doctors by adjusting the level of state medical benefits. The question presented was whether the *placement* decisions should therefore be treated as those of the state for purposes of a section 1983 action. The Court noted that the challenged decisions "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State," *Blum,* 457 U.S. at 1008, 102 S.Ct. at 2788, and held that the transfer decisions were not state action.

In *Rendell-Baker,* teachers sought to bring a section 1983 action against the school which had formerly employed them. They alleged that they had been wrongfully discharged, and argued that the terminations were state actions because their employer received a high proportion of its funds from state and federal agencies. The Court in *Rendell-Baker* followed the analysis of the *Blum* opinion, and noted that, while the school received public funds, its personnel decisions were largely unregulated by the state, *Rendell-Baker,* 457 U.S. at 841–42, 102 S.Ct. at 2771–72. The Court held that the school was not a state actor in its personnel decisions.

The facts of the case at bar present a number of contrasts to those of *Blum* and *Rendell-Baker.* First, plaintiffs here challenge HUD's acts directly, not under a theory of vicarious liability for the actions of local PHA authorities. Second, the decisions which produce the racial makeup of

public housing are heavily regulated by HUD: HUD has recognized its duty under Title VI to involve itself in these decisions, by forcing local providers of public housing to follow tenant assignment, site placement, and affirmative action marketing plans designed to prevent racial segregation. HUD is directly involved in all aspects of tenant placement. Finally, neither *Blum* nor *Rendell-Baker* deals with federal funding and regulation of racial segregation. Nor do these cases purport to overrule the unambiguous precedent, cited above, forbidding states and the federal government from funding or otherwise involving itself in racially discriminatory actions. It is clear that the action challenged here is federal action, and that it constitutes direct support for racial discrimination.

█ Defendants argue that plaintiffs must show, not only that HUD has supported racial discrimination, but that it has done so with discriminatory intent. While the record does establish HUD's intent to discriminate, *see infra,* this argument fundamentally misapprehends the law. Defendants rely principally on Supreme Court cases involving facially neutral government practices allegedly having a disparate impact. *See Personnel Administrator v. Feeney,* 442 U.S. 256, 273–81, 99 S.Ct. 2282, 2293–97, 60 L.Ed.2d 870 (1979); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1976); *Washington v. Davis,* 426 U.S. 229, 239–241, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). The actions complained of here are not in any sense facially neutral: HUD supports those authorities it knows to discriminate. HUD has received numerous indications that substantially all local PHA's in the class counties discriminate, and even that they intend to keep doing so, and in *no instance* has effective action to end or discourage discrimination been taken. HUD has also followed racially conscious policies which have furthered this discrimination. These policies include refusal to fund projects in areas of minority concentration, failure to enforce its own affirma-

tive marketing regulations, and use of race-conscious remedial tenant assignment plans which appear to be utterly ineffectual in effecting desegregation. Nor does HUD suggest what its facially neutral actions might be, or how they could lead to the stark pattern of segregation found in the class counties. The cases relating to facially neutral government action are therefore simply inapposite. Indeed, if defendants' argument were correct, there would be no barrier to the federal government's funding of racially segregated schools if the government were to protest that its motives were educational, rather than discriminatory. *National Black Police Association v. Veide,* 712 F.2d 569, 581 n. 70 (D.C.Cir.1983).

Even if HUD's discriminatory intent had to be shown, the same finding of liability would obtain. *Washington v. Davis* holds, first, that discriminatory intent must be shown to establish liability when facially neutral government action is at issue and, second, that a mere showing of statistically disparate impact will often be insufficient to give rise to a tenable inference of discriminatory intent. *Davis,* 426 U.S. at 244–245, 96 S.Ct. at 2049–2050. " 'Discriminatory purpose,' however, implies more than intent as violation or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296 (citation omitted). These cases do not, as defendants suggest, set out a substantive rule of law that a massively discriminatory outcome cannot be used to show intent to achieve this result. Rather, they discuss the circumstances under which intent may be inferred from statistics. In a footnote, the Court in *Feeney* explained further:

> [w]hen the adverse consequences of a law upon an identifiable group are inevitable ... a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Id.* at 279 n.25, 99 S.Ct. at 2296 n. 25. This footnote is highly relevant to HUD's arguments. First, it is evident that the adverse consequences of HUD's policies upon blacks *were* inevitable: HUD's policies of ineffectively enforcing Title VI, of failing to supervise racially prejudiced local PHA's, of vetoing construction in minority neighborhoods, and of ignoring regulations requiring HUD to monitor affirmative action in marketing were simply a blueprint for segregation. Nor has HUD suggested that segregation is an "unavoidable consequence" of a legitimate policy. In this action, at least, the court is satisfied that the inference which arises from the segregated housing in the class counties *does* ripen into proof.

HUD's discriminatory intent is, moreover, demonstrated by an "inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, *quoted in Rogers v. Lodge,* 458 U.S. 613, 618, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012 (1982). HUD's chief defense to the claim of intentional discrimination is the contention that, until this action was instituted, HUD was ignorant of the uses to which the public funds it distributes were being put. HUD seems to argue that it can fulfill its duty to eradicate segregation through the ostrich-like tactic of maintaining this ignorance.

 It has been clear at least since the passage of Title VIII—if not from the date of Executive Order 11063 and HUD's inception as a federal agency—that HUD has had an affirmative duty to eradicate segregation. A necessary prerequisite for ful-

filling this duty is to obtain information about discrimination practiced under HUD's auspices. *Shannon v. U.S. Department of Housing and Urban Development*, 436 F.2d 809, 821 (3d Cir.1970); *see also Penick v. Columbus Board of Education*, 663 F.2d 24, 27 (6th Cir.1981) (state school board policy requiring complaints of segregation before an investigation would be commenced, coupled with available indications that segregation did exist, show violation of duty to investigate); *Reed v. Rhodes*, 662 F.2d 1219, 1225 (6th Cir.1981) (state school board has duty under state and federal law to discover and eliminate segregation in schools). Even if its protestations of ignorance were to be accepted, HUD would have violated the Fifth Amendment by willfully ignoring the facts necessary to fulfill its constitutional and statutory duties.[9]

HUD's duty to investigate aside, it is clear that HUD was actually aware of the segregated housing which gave rise to this action. The record contains a number of instances where HUD received such knowledge directly. These incidents constitute compelling evidence that housing in the class action counties was substantially segregated long before this action was filed. The court has listed twenty such instances. In each case, a local housing authority was found, before the institution of this action, to be in substantive violation of Title VI or of the regulations promulgated to implement its mandates. Such a mass of violations in representative PHA's should have led HUD to a realization that violations of Title VI were endemic in the class counties.

HUD actually realized the true situation. Knowledge of discrimination in the class counties is demonstrated by the September 20, 1974, memorandum, titled "TO ALL HOUSING AUTHORITIES," which stated that surveys conducted by the Dallas Area Office had "revealed numerous cases of non-compliance in implementing the Tenant Selection and Assignment Plan adopted in the Methods of Administration." Volume 41, Fort Worth Office Records, at 342–43. The memorandum informs all PHA's that adoption of the plan is required under Title VI, and that Title VIII mandates that all citizens be given an equal right to apply for public housing. It concludes that "[t]he Dallas Area Office Management and Equal Opportunity staff [of HUD] will continue to review housing authorities['] compliance with the above requirements." This memorandum shows, first, that HUD was conducting periodic reviews; second, that these reviews indicated widespread non-compliance with HUD's Title VI regulations; and, finally, that HUD was aware that instances of non-compliance were not limited to the actual abuses officially reported in reviews. HUD's own surveys, as evidenced by the reports themselves and by its memorandum, clearly show that HUD was aware of the segregated nature of the housing which it funds.

In addition, it should be noted, HUD had received numerous indications that segregation was present in HUD housing everywhere, and therefore *a fortiori* widespread in the class action counties. Allegations identical to those here have been raised in many cases against HUD. *See e.g., Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir.1983); *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971); *Cohen v. Public Housing Administration*, 257 F.2d 73 (5th Cir.1958); *Heyward v. Public Housing Administration*, 238 F.2d 689 (5th Cir.1956). Supplementary to allegations brought in the course of litigation, HUD received notice that the procedures designed to enforce Title VI were not being followed. This notice was contained in the 1977 Civil Rights Division Interagency Survey, which found that HUD had failed in its Title VI enforcement duties. That document refers to HUD's own admission, in its fiscal year 1974 budget submission, that it "had never adequately met its Title VI obligations" and

---

9. "O foolish people, and without understanding: which have eyes and see not; which have ears, and hear not." 5 *Jeremiah* 21.

had completed reviews of only 120 of its 12,000 recipients that year. Interagency Survey, *supra,* at 28. The survey also cites a 1976 Memorandum to all HUD regional administrators from James H. Blair, Assistant Secretary of HUD Fair Housing and Equal Opportunity ("FHEO"), which states that "because our past record of Title VI enforcement does not adequately meet the mandate of the statute, it is imperative that a marked improvement in compliance and enforcement be demonstrated . . . ." *Id.*

Auxiliary information about the generally segregated nature of public housing was available to HUD through a number of major public events, such as the issuance of President Kennedy's Executive Order 11063, banning racial discrimination in federally funded programs, and from the passage of Titles VI and VIII. In particular, the passage of Title VIII was a recognition by the Congress that problems of discrimination existed in public housing throughout the nation. Senator Brooks, speaking in support of the Act, accused HUD of having an attitude of "amiable apartheid" and stated:

> Rarely does HUD withhold funds or defer action in the name of desegregation. In fact, if it were not for all the printed guidelines the housing agencies have issued since 1964, one would scarcely know a Civil Rights Act had been passed.

114 Cong.Rec. 2281 (1968). As the facts of this action demonstrate, the same could be said at the present.

Defendants argue that any allegation of discriminatory intent is refuted by the mass of HUD regulations which contain declarations of intent not to discriminate. HUD cites no support for the proposition that publishing antidiscriminatory regulations is dispositive of the issue of intent. Nor could HUD do so, given that its officers have testified that they see no inconsistency between following these regulations and maintaining segregated housing. *See supra* pp. 30–31.

█ HUD's intent to discriminate is established by the combination of HUD's disingenuous assertions of ignorance, its actual knowledge of segregation, and its continuing financial support of each public housing site in the class counties. In those instances where HUD responded at all to its knowledge of discrimination, it has been only through the use of compliance agreements which have been shown by HUD's own data to be ineffective in dealing with discrimination. The picture which emerges from the undisputed facts in this action is nearly identical to that painted by the Court of Appeals for the Eighth Circuit in its examination of HUD's role in nurturing segregation in Texarkana, Arkansas:

> In our view, the only reasonable inference that can be drawn is that HUD's actions were motivated at least in part by a discriminatory purpose. It is inconceivable that HUD would have so frequently acted to approve the [Texarkana Housing Authority's] actions for so long unless its officials held that view that segregation and discrimination were acceptable. The possible neutral explanations for the agency's actions concerning changes in the [Authority's] operation—a lack of resources or a desire to supply funds for low income housing—do not sufficiently negate the strong inference of discriminatory purpose that arises from the objective evidence contained in the agency's own files.

*Clients' Council v. Pierce,* 711 F.2d at 1423.

The facts in this action are highly similar to those which led to the conclusion of discriminatory intent quoted above. Defendants have made no attempt to distinguish *Clients' Council* from the case at bar; their extensive briefs make no reference to this opinion, and cite only the lower court opinion which the Eighth Circuit reversed. The court can find nothing in the record here that suggests a conclusion other than that reached in *Clients' Council.*

The record in this case clearly makes out defendant's violation of the Fifth Amendment to the United States Constitution. HUD has consistently supported and funded each project instituted under its aegis. HUD's inactivity has been limited to those aspects of its affirmative action responsibilities which might have an actual impact in desegregating federally funded housing. It has actively employed race-conscious policies which result in segregation. In the area covered by this action, those who have administered these projects have done so in a way clearly animated by racial prejudice. HUD has a duty to know how its money is spent, and in fact has known that it is supporting segregated housing in East

Texas. Notwithstanding, it has continued to actively support the system in perhaps the most effective possible way—by paying for it. HUD has thus played a crucial and continuing role in creating and maintaining a large system of publicly funded segregated housing.

*Plaintiffs' Remaining Claims*

■■■■■■ In addition to their constitutional claims, plaintiffs allege that HUD's conduct is also in violation of 42 U.S.C. §§ 1981 and 1982, as well as Titles VI and VIII. This court's finding that HUD had violated the Fifth Amendment, both through its knowing support of public housing authorities which intentionally discriminate, and through its own acts of intentional discrimination, is dispositive of the question of liability under §§ 1981 and 1982. *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (equating standard for violation of § 1981 and the Equal Protection Clause of the Fourteenth Amendment); *Memphis v. Greene,* 451 U.S. 100, 131, 101 S.Ct. 1584, 1602, 67 L.Ed.2d 769 (1981) (White, J. concurring) (purposeful discrimination clearly violates § 1982). It is obvious that intentional discrimination also violates Title VIII, 42 U.S.C. § 3608(c) ("All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this Title and shall cooperate with the Secretary to further such purpose."). In its order certifying the class, this court held that there is an implied private right of action under Title VI. Title VI imposes a duty on HUD to eliminate racial discrimination from the programs it funds. This court's finding that HUD has not done so, but has, on the contrary, deliberately nurtured this discrimination, as well as engaging in discrimination itself, shows that HUD has violated Title VI.

■■■■ Defendants concede that plaintiffs need not pursue administrative avenues before bringing suit under the Fifth Amendment and §§ 1981 and 1982. HUD argues, however, that plaintiffs cannot pursue their Title VI claim in this forum because they have failed to exhaust their administrative remedies, set out in HUD regulations, 24

CFR § 1.7. That regulation reads, in pertinent part:

**§ 1.7 Conduct of Investigations.**

(b) Complaints. Any person who believes himself or any specific class of persons to be subjected to discrimination prohibited by this Part 1 may by himself or by a representative file with the responsible Department official or his designee a written complaint....

(c) Investigations. The responsible Department official or his designee shall make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this Part 1.

Counsel for plaintiffs sent a written complaint to defendant in 1979. This complaint stated, *inter alia,* "HUD-supported rental housing in East Texas is thoroughly racially segregated. This has always been the case. HUD knows of this pattern, HUD does take measures to attempt to correct the situation, but usually blames the situation on the local authorities, landlords and tenants saying this is the way they want it." The letter refers to the area of the class action counties only. Letter to Gordon Lewis, Office of Area Counsel, HUD (October 9, 1979). (Exhibit attached to Statman Deposition.) Thus HUD was presented with a complaint, containing substantially the allegations of this law suit, in the year before this action was filed. HUD does not allege that it instituted a "prompt investigation" of these allegations, as required by 24 C.F.R. § 1.7(c). As a factual matter, therefore, the plaintiff class *did* exhaust its administrative remedies.

■■■■ Even if the letter of October 9, 1979, were not considered a complaint of discrimination, the same result would obtain. There can be no exhaustion requirement here, because it is "clear beyond doubt that the relevant administrative agency [in this case] will not grant the relief in question." *American Federation of Government Employees v. Acree,* 475 F.2d 1289, 1292 (D.C.Cir.1973), (citing *Montana National Bank of Billings v. Yellowstone County,* 276 U.S. 499, 505, 48 S.Ct. 331, 333, 72 L.Ed. 673 (1928)); *see also Rios v. Read,* 480 F.Supp. 14, 20 (E.D.N.Y.1978); *NAACP v. Wilmington,* 426 F.Supp. 919, 924 (D.Del.1977). The relief sought in this action is the disestablishment of segregated public housing in the class counties.

The record developed by the parties is replete with instances of violations of Title VI regulations having been brought to HUD's attention. HUD cannot point to a single occasion where such information furnished to it has resulted in integration. Defendant is disingenuous in asserting that plaintiffs should be forced to go through a proven "exercise of futility," *Lodge 1858, American Federation of Government Employees v. Pierce*, 436 F.2d 882, 896 (D.C.Cir.1970), *quoted in American Federation*, 475 F.2d at 1292, in the hopes that it will, for the first time, prove effective. This is especially true when HUD's own officials in charge of the Title VI review process in East Texas have testified, in depositions submitted by the parties, that in their view Title VI's requirements are satisfied whenever federal funding recipients carry out HUD procedures properly, and that HUD has no power or authority to seek actual desegregation, *see* Chaires Deposition at 124–125; Eubanks Deposition at 23–24. Since plaintiffs seek more than the paper relief available through HUD procedures, there can be no requirement that these procedures be exhausted.

 Defendants further argue that this action is blocked by the doctrine of sovereign immunity. Sovereign immunity does not bar a suit to enjoin unconstitutional actions by a federal officer. *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 690–91, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1948). Plaintiffs here allege and show that HUD's conduct violates the Fifth Amendment, and therefore a host of federal statutes designed to prevent discrimination by federal officers. *See Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1962); *Gatreaux v. Romney*, 448 F.2d 731, 735 (7th Cir.1971), and cases cited therein.

In addition, 5 U.S.C. § 702 explicitly authorizes the type of action against federal agencies which the plaintiffs have brought. That section reads, in pertinent part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States....

5 U.S.C. § 702.

The legislative history suggests that the language excerpted above, which was contained in the 1976 amendment to § 702, was intended to block the use of the sovereign immunity defense in actions seeking equitable relief against the government: "[T]he time has now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." H.R.Rep. No. 1656, 94th Cong., 2d Session, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6121, 6129. The Court of Appeals for the Fifth Circuit has held that "the 1976 amendment to [§ 702] waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *Sheehan v. Army and Air Force Exchange Service*, 619 F.2d 1132, 1139 (5th Cir.1980), *rev'd in part on other grounds*, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982). *See also B.K. Instruments Inc. v. U.S.*, 715 F.2d 713, 724–25 (2nd Cir.1983); *Schnapper v. Foley*, 667 F.2d 102 (D.C.Cir. 1981); *Newsom v. Vanderbilt University*, 653 F.2d 1100, 1107 (6th Cir.1981); *Beller v. Middenhorf*, 632 F.2d 788, 797 (9th Cir. 1980); *Jaffee v. United States*, 592 F.2d 712, 718–19 (3rd Cir.1979).

HUD relies heavily on *Council for the Blind v. Regan*, 709 F.2d 1521 (D.C.Cir. 1983), to support the agency's argument of sovereign immunity. In *Council for the Blind*, two individuals and seven organizations challenged the way in which the Office of Revenue Sharing, pursuant to the Act, gave "no-strings" block grants to state and local governments. Plaintiffs alleged that localities used the grant money discriminatorily. The court found that Congress, under the Act, had not authorized a private cause of action, and held that the agency action was only reviewable under the Administrative Procedure Act. *Id.* at 1525. The court in *Council for the Blind* stressed, however, that the grants at issue were made "without strings"—that is, without the kind of regulations and monitoring at issue in the action at bar—and that Title VI was not implicated. *Id.* at 1531 n. 69. HUD's funds *do* have strings attached: their recipients are forbidden to engage in discrimination by HUD's Title VI regulations. Nor is it clear that *Council for the Blind* has any relevance to the

issue of sovereign immunity. The opinion in that action makes no reference to sovereign immunity. Rather, it refuses to find an implied cause of action under the Revenue Sharing Act of 1972. In contrast, there are numerous well-settled causes of action in the case at bar. None of these are blocked by the doctrine of sovereign immunity.

### Standing

Defendants argue that plaintiffs lack standing to bring this action. The question of standing was discussed at length in this court's order certifying the class in this action, *Young v. Pierce*, 544 F.Supp. 1010, 1019–27 (E.D.Tex.1982). Defendants' arguments will be discussed only to the extent that they are based on developments in the law since this court's earlier order.

■■■ HUD argues that plaintiffs cannot seek injunctive relief because they cannot show a threat that their past injuries will be repeated in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Defendants draw an interesting parallel between their former Title VI enforcement activities and the choke-hold used by Los Angeles police officers in *Lyons*. While there may be similarities between the two practices, the concerns of the *Lyons* Court are not apposite here. It is clear that plaintiffs' injuries are systemic, longstanding, and ongoing, and there is an obvious threat that these injuries—that is, segregated housing—will continue in the future. Indeed, this appears to be a virtual certainty, if HUD is left to its own devices. The Court in *Lyons* held that " '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing adverse effects.' " *Id.* at 102, 103 S.Ct. at 1665 (*quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). Since such "continuing adverse effects" in the form of a system of segregated housing are clearly present here, plaintiffs have standing to seek injunctive relief.

Defendants also rely on *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), in arguing that plaintiffs here lack standing. In *Allen*, parents of black school children brought a nationwide class action against the Internal Revenue Service. Plaintiffs alleged that the IRS had not adopted sufficient standards and procedures to fulfill its duty to deny tax-exempt status to racially discriminatory private schools, and argued that the IRS's practices harmed their children by frustrating federal efforts at school desegregation and thereby reducing the quality of the public school education their children received. The plaintiffs did not "allege that their children have been the victims of discriminatory exclusion from the schools whose tax exemptions they challenge as unlawful." *Id.* Nor did the plaintiffs allege that their children had applied or would apply to the schools. *Id.* Justice O'Connor, writing for a four-justice plurality, found that under these facts the plaintiff class lacked standing.

The distinguishing features of the case at bar are manifest. The plaintiffs here *have* alleged—and shown—that they are the victims of discriminatory segregation. The plaintiff class includes residents of segregated housing, as well as all those who may apply for this housing. The *Allen* case makes clear the validity of plaintiff's standing.

### Scope of Review

HUD argues that its Title VI and VIII actions can only be reviewed under the Administrative Procedure Act, 5 U.S.C. § 551 and § 701. Defendants claim that the appropriate scope of review of their actions are the "arbitrary and capricious standard" contained in the Act, 5 U.S.C. § 706(2)(A). The court finds it unnecessary to decide whether review of these claims is governed by the APA, as HUD's actions are clearly in violation of Titles VI and VIII, even under the most generous standards of review. *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir.1983).

### Mootness

■■■ The party urging mootness bears the heavy burden of demonstrating that discontinuance of the challenged activity has destroyed any controversy between the parties. *Vitek v. Jones*, 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980); *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Part of this burden includes the

necessity of showing that there are no present effects of past conduct that require undoing. *Zablocki v. Redhail*, 434 U.S. 374, 382 n. 9, 98 S.Ct. 673, 679 n. 9, 54 L.Ed.2d 618 (1978); *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 2582–2584, 81 L.Ed.2d 483, 492–495 (1984). Neither the granting of specific relief against a HUD public housing authority nor HUD's promise to stop any further discriminatory acts moots a case alleging independent violations of HUD's duties. *Gautreaux v. Romney*, 448 F.2d 731, 735–36 (7th Cir.1971).

 HUD's claim of mootness is based on an affidavit of HUD's General Counsel, John Knapp, the allegations of which have been set out above. *See supra* p. 32. While this affidavit alleges the institution of a plan by HUD to transfer over-and under-housed tenants, and to create an agenda for further desegregation, it does not even aver that HUD's housing has been desegregated. It alleges only that it has *begun* a process which *may* lead to desegregation. While these efforts may be relevant to the issue of appropriate remedy, it is clear that the effects of past discrimination still burden the plaintiff class. The action is not moot. It is therefore

**ORDERED** that plaintiffs motion for summary judgment on the issue of liability shall be, and it is hereby, **GRANTED.** It is further

**ORDERED** that defendants' motions for summary judgment, to decertify the class and to modify the class shall be, and they are hereby, **DENIED.**

## APPENDIX

The following is a breakdown of racial occupancy in housing project sites for which HUD has supplied racial occupancy data, organized by county and town. Information on Hispanic occupancy is given where applicable.

Following the name of each of the class action counties is the percentage of that county's population living under the poverty level which is black, according to the 1980 U.S. Census.

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Anderson County (poverty population 45% black): | | | |
| Palestine | | | |
| Dogwood Gardens (I–A) | 6.3 | 93.7 | — |
| Mt. Vernon Manor (I–A) | 96.7 | 3.3 | — |
| Pine Valley Apts. (I–A) | 4.2 | 95.8 | — |
| Angelina County (poverty population 40% black): | | | |
| Diboll | | | |
| Tex 229–1 | 56 | 27 | 17 |
| Tex 229–2 | 53.1 | 14.1 | 22.8 |
| Tex 229–3 | 59.2 | 4.1 | 36.7 |
| Tex 229–4 | 2.3 | 96.6 | 1.1 |
| Walter Allen (221(d)(3)) | 100 | 0 | — |
| Huntington | | | |
| HHA | 0 | 100 | — |
| Lufkin | | | |
| Royal Oaks § 8 New | 11.4 | 88.6 | — |
| Chestnut Park § 8 New | 56 | 34* | — |
| Pinewood Park | 97.8 | 2.2 | — |
| The Arrangement (I–A) | 2.4 | 97.6 | — |
| Timber Ridge | 2.1 | 97.9 | — |
| Bowie County (poverty population 50% black) | | | |
| DeKalb | | | |
| Tex 137–1 North | 83 | 17 | — |
| Tex 137–1 Rutherford | 0 | 100 | — |

* Figures do not always add up to 100% because of the presence of other minority groups living in the housing projects, who are not specifically listed in the statistics.

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Tex 137–2 | 100 | 0 | — |
| Tex 137–3 Cooper 1 | 90 | 10 | — |
| Tex 137–3 Cooper 2 | 0 | 100 | — |
| Maud | | | |
| Tex 188–1A | 0 | 100 | — |
| Tex 188–1B | 100 | 0 | — |
| Tex 188–2 | 25 | 75 | — |
| New Boston | | | |
| Tex 54–1 | 14 | 86 | — |
| Tex 54–2 | 100 | 0 | — |
| Tex 54–3A | 11 | 89 | — |
| Tex 54–3B | 100 | 0 | — |
| Tex 54–3C | 0 | 100 | — |
| Tex 54–4 | 2 | 98 | — |
| Tex 54–6 | 55 | 45 | — |
| Tex 54–7 | 43 | 43 | 14 |
| Texarkana | | | |
| Family Units: | | | |
| Tex 14–1 | 97.5 | 2.5 | — |
| Tex 14–2 | 97.4 | 2.6 | — |
| Tex 14–3 | 100 | 0 | — |
| Tex 14–5 | 74 | 26 | — |
| Elderly Units: | | | |
| Tex 14–1 | 92.9 | 7.1 | — |
| Tex 14–2 | 100 | 0 | — |
| Tex 14–7 Pine St. | 22.7 | 77.3 | — |
| Tex 14–7 Wood St. | 50 | 50 | — |
| Tex 14–7 Akin St. | 0 | 100 | — |
| Tex 14–7 Allen St. | 36.4 | 63.6 | — |
| Tex 14–8 | 17.2 | 79.3 | 3.5 |
| Town North Apt. (236, Rent Supp.) | 42.4 | 57.6 | — |
| Sunset Apts. (221(d)(3), Rent Supp.) | 100 | 0 | — |
| Quail Creek (I–A) | 4.1 | 95.9 | — |
| Tanglewood Terrace (I–A) | 6.7 | 93.3 | — |
| Woodridge Apts. (I–A) | 5.7 | 94.3 | — |
| Camp County (poverty population 56% black) | | | |
| Pittsburgh | | | |
| Tex 49–1 | 0 | 100 | — |
| Tex 49–2 | 100 | 0 | — |
| Cass County (poverty population 46% black) | | | |
| Linden | | | |
| North Side of Hwy. 155 | 0 | 100 | — |
| South Side of Hwy. 155 | 100 | 0 | — |
| Hughes Springs | | | |
| Tex 112–1 #1 | 5 | 95 | — |
| Tex 112–1 #2 | 0 | 100 | — |
| Tex 112–2 | 100 | 0 | — |
| Patman Switch § 8 New | 70.7 | 29.3 | — |
| Cherokee County (poverty population 40% black) | | | |
| Alto | | | |
| 272–1 | 20 | 80 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| 272–2 | 13 | 87 | — |
| 272–3 | 10 | 90 | — |
| **Jacksonville** | | | |
| Travis Towers Apt. § 8 New | 2.3 | 97.7 | — |
| Sunnydale Apt. (221(d)(3), Rent Supp.) | 12.5 | 87.5 | — |
| Sweet Union Apt. (221(d)(3), Rent Supp.) | 98.8 | 1.2 | — |
| <u>Delta County</u> | | | |
| Cooper | | | |
| Tex 76–1 Hwy. Village | 6.5 | 93.5 | — |
| Tex 76–1 NE 5th St. | 100 | 0 | — |
| Tex 76–2 | 21.7 | 78.3 | — |
| <u>Franklin County</u> (poverty population 6% black) | | | |
| Mt. Vernon | | | |
| Site 1 | 0 | 100 | — |
| Site 2 | 70.9 | 29.1 | — |
| <u>Gregg County</u> (poverty population 47% black) | | | |
| Gladewater | | | |
| Tex 58–1 | 100 | 0 | — |
| Tex 58–2 | 100 | 0 | — |
| Tex 58–3 Greenway Terrace | 42 | 58 | — |
| Tex 58–3 Pacific Gardens | 19 | 81 | — |
| Tex 16–R000–018 § 8 New | 12 | 88 | — |
| Longview | | | |
| Eden Place § 8 New | 2.5 | 97.5 | — |
| Hillside Village § 8 New | 3 | 97 | — |
| Ware Meadows § 8 New | 39 | 61 | — |
| Bellaire Manor (221(d)(3), Rent Supp.) | 100 | 0 | — |
| Penwood Apts. (236, BMIR) | 11 | 89 | — |
| Jerusalem Trust (221(d)(3), Rent Supp.) | 100 | 0 | — |
| Briar Meadows (I–A) | 17.9 | 82.1 | — |
| Lake Pine City (I–A) | 17.3 | 82.7 | — |
| Sunflower East (I–A) | 10 | 90 | — |
| <u>Hardin County</u> (poverty population 34% black) | | | |
| Silsbee | | | |
| Prince Hall Villa (I–A) | 98 | 0 | — |
| <u>Harrison County</u> (poverty population 65% black) | | | |
| Marshall | | | |
| Bellaire Manor (221(d)(3), Rent Supp.) | 100 | 0 | — |
| Pine Haven Apts. (236 BMIR) | 35 | 65 | — |
| Season Keys (236 BMIR) | 50.1 | 49.9 | — |
| Ward Plaza Apts. (221(d)(3), Rent Supp.) | 100 | 0 | — |
| Waskom | | | |
| Waskom Arms (236 BMIR) | 24 | 76 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| **Henderson County** (poverty population 26% black) | | | |
| Athens | | | |
| New Haven Apts. (221(d)(3)) | 73 | 27 | — |
| Malakoff | | | |
| Tex 209–1 | 0 | 100 | — |
| Tex 209–2 | 100 | 0 | — |
| Trinidad | | | |
| Tex 237–1 First St. | 0 | 100 | — |
| Tex 237–1 Lincoln St. | 17 | 83 | — |
| Tex 237–1 Birdsong St. | 100 | 0 | — |
| Tex 237–2 | 0 | 100 | — |
| **Hopkins County** (poverty population 21% black) | | | |
| Como | | | |
| 1 Site | 0 | 100 | — |
| Cumby | | | |
| 1 Site | 0 | 100 | — |
| Sulphur Springs | | | |
| CME Open Village Apts. (I–A) | 98 | 2 | — |
| **Houston County** (poverty population 60% black) | | | |
| Crockett | | | |
| Tex 222–1 Lewis Circle | 98 | 2 | — |
| Tex 222–1 Sallas Avenue | 0 | 100 | — |
| Tex 222–1 Second Avenue | 100 | 0 | — |
| Tex 222–1 Dudson Dr. | 88 | 12 | — |
| Tex 222–2 | 100 | 0 | — |
| Prince Hall Manor (I–A) | 100 | 0 | — |
| Grapeland | | | |
| Tex 295–1 | 100 | 0 | — |
| Tex 295–2 | 0 | 100 | — |
| **Jasper County** (poverty population 43% black) | | | |
| Kirbyville | | | |
| Tex 282–1 Levert | 0 | 100 | — |
| Tex 282–1 Lanier | 100 | 0 | — |
| Tex 282–2 Levert | 6.3 | 93.7 | — |
| Jasper | | | |
| Pineview Apts. (221(d)(3)) § 8 | 87.6 | 12.4 | — |
| **Jefferson County** (poverty population 63% black) | | | |
| Beaumont | | | |
| Neches Park | 100 | 0 | — |
| Magnolia Gardens | 93 | 7 | — |
| Concord Homes | 100 | 0 | — |
| Lucas Gardens (Elderly) | 4 | 96 | — |
| Grand Pine Courts (Elderly) | 100 | 0 | — |
| Northridge Manor § 8 New | 92 | 8 | — |
| Raintree Tower | 20 | 80 | — |
| Park Shadows § 8 New | 28.7 | 71.3 | — |
| Seville Apts. § 8 New | 1.2 | 98.8 | — |
| Plymouth Village (221(d)(3), Rent Supp.) | 98 | 12 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Sunlight Manor (221(d)(3), Rent Supp.) | 99.2 | .8 | — |
| Virginia Manor § 236 Rent Supp. | 99.09 | .9* | — |
| Washington Manor § 236 Rent Supp. | 100 | 0 | — |
| Central Apartments (I–A) | 7.56 | 92.5 | — |
| Hollywood Courts (I–A) | 100 | 0 | — |
| Hirote Apts. (I–A) | 16.7 | 66.7 | 16.6 |
| Lincoln Apts. (I–A) | 100 | 0 | — |
| Lyleden Apts. (I–A) | 33.3 | 66.7 | — |
| Northway Arms | 6.3 | 93.7 | — |
| Northway Place Apts. | 5.6 | 94.4 | — |
| **Nederland** | | | |
| Courtney House Apts. § 8 New | 3.2 | 96.8 | — |
| **Port Arthur** | | | |
| Louis Manor 221(d)(3) | 100 | 0 | — |
| Prince Hall 221(d)(3) | 100 | 0 | — |
| Foster Village (I–A) | 3.7 | 90.3 | 6 |
| Griffin Park (I–A) | 16.9 | 88.9 | 4.2 |
| Jefferson Apts. (I–A) | 57.6 | 42.4 | — |
| Villa Main Apts. (I–A) | 13.8 | 96.2 | — |
| Stonegate Manor (I–A) | 2.5 | 94.1 | 3.4 |
| **Graves** | | | |
| Beverly Place | 42.7 | 57.3 | — |
| Gulfway Provincial | 4.2 | 94.1 | 1.7 |
| **Port Neches** | | | |
| Ridgewood Manor | 0 | 94.8 | 5.2 |
| **Lamar County** (poverty population 37% black) | | | |
| **Blossom** | | | |
| West Division St. | 0 | 100 | — |
| **Deport** | | | |
| 1 Site | 0 | 100 | — |
| **Paris** | | | |
| Tex 48–2 | 100 | 0 | — |
| Tex 48–1 | 13.2 | 86.8 | — |
| Park Gardens N. (236 BMIR) | 97 | 3 | — |
| Roxton Arms 221(d)(3) | 0 | 100 | — |
| **Liberty County** (poverty population 31% black) | | | |
| **Cleveland** | | | |
| 198–1 A | 0 | 100 | — |
| 198–1 B | 100 | 0 | — |
| 198–1 C | 100 | 0 | — |
| 198–1 A–Elderly | 0 | 100 | — |
| 198–1 B–Elderly | 100 | 0 | — |
| Park Place Apts. § 8 New | 10.2 | 89.8 | — |
| **Marion County** (no census data available) | | | |
| **Jefferson** | | | |
| TX 44–1 | 0 | 100 | — |
| TX 44–2 | 100 | 0 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| **Morris County** (poverty population 53% black) | | | |
| Daingerfield | | | |
| Tex 106–1 | 0 | 100 | — |
| TX 106–2 | 100 | 0 | — |
| TX 106–3(a) | 0 | 100 | — |
| TX 106–3(b) | 100 | 0 | — |
| Naples | | | |
| Tex 121–1 West | 0 | 100 | — |
| Tex 121–1 East | 100 | 0 | — |
| Tex 121–2 West | 0 | 100 | — |
| Tex 121–2 East | 100 | 0 | — |
| Tex 121–3 West | 0 | 100 | — |
| Tex 121–3 East | 100 | 0 | — |
| Tex 121–4 | 0 | 100 | — |
| Tex 121–5 | 0 | 100 | — |
| Omaha | | | |
| Tex 122–1 3rd St. | 0 | 100 | — |
| Tex 122–1 School St. | 100 | 0 | — |
| Tex 122–2 Sloss Ave. | 0 | 100 | — |
| Tex 122–3 Sloss Ave. | 0 | 100 | — |
| Tex 122 Cartwright | 100 | 0 | — |
| Tex 122–4 Sloss Circle | 10 | 90 | — |
| Tex 122–5 Sloss St. | 0 | 100 | — |
| Cartwright | 100 | 0 | — |
| **Nacogdoches County** (poverty population 33% black) | | | |
| Garrison | | | |
| 1001 Francis | 0 | 100 | — |
| Cedar St. | 100 | 0 | — |
| Nacogdoches | | | |
| Nacogdoches Handicapped § 8 New | 8.3 | 91.7 | — |
| Pine Lakes Estates § 8 New | 11.2 | 88.8 | — |
| Northridge Arms (I–A) | 0 | 100 | — |
| Eastwood Terrace (221(d)(3)), § 8 | 100 | 0 | — |
| Oak Hill Plaza (221(d)(3)), § 8 | 100 | 0 | — |
| **Newton County** (poverty population 54% black) | | | |
| Newton | | | |
| Tex 223–1 Didrikson | 0 | 100 | — |
| Tex 223–1 Odom Homes | 100 | 0 | — |
| Tex 223–2 | 75 | 25 | — |
| **Orange County** (poverty population 27% black) | | | |
| Orange County Housing Authority | | | |
| West Orange | 0 | 100 | — |
| Bridge City | 0 | 100 | — |
| Cone | 0 | 100 | — |
| Vidor–1 | 0 | 95 | 5 |
| Vidor–2 | 0 | 96 | 4 |
| Orange City | | | |
| 37–1 | 22.6 | 77.4 | — |
| 37–2–3 | 97.1 | 2.9 | — |
| 37–4A | 96 | 4 | — |
| 37–4B | 25 | 75 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Heritage Center § 8 New | 3.4 | 96.6 | — |
| Chivas Square (I–A) | 5.8 | 93.2 | 1 |

Panola County (poverty population 47% black)
Beckville
| 1 Site | 6.3 | 93.7 | — |

Polk County (poverty population 34% black)
Corrigan
| N. West St. | 73 | 9 | 18 |
| S. West St. | 100 | 0 | — |
| W. Second | 0 | 100 | — |
| Hospital Site | 0 | 100 | — |
| Central | 0 | 100 | — |

Livingston
| Site 1 | 33 | 67 | — |
| Site 2 | 55 | 45 | — |
| Hudman Addition § 8 New | 1.3 | 98.7 | — |

Red River County (poverty population 38% black)
Avery
| 1 Site | 0 | 100 | — |

Bogota
| 1 Site | 0 | 100 | — |

Clarksville
| Site 1 | 0 | 100 | — |
| Site 2 | 100 | 0 | — |
| Site 3 | 100 | 0 | — |

Detroit
| 250–1 | 0 | 93.8 | 6.2 |
| 250–2 | 21 | 79 | — |

Rusk County
Henderson
| Tex 50–1 | 76 | 24 | — |
| Tex 50–2 | 100 | 0 | — |
| Tex–16–E050–001 DEL 1975, | | | |
| § 8 Existing | 14 | 86 | — |
Overton
| Tex 68–1 Ward | 0 | 100 | — |
| Tex 68–1 Carver | 100 | 0 | — |
| Tex 68–2 North | 0 | 100 | — |
| Tex 68–2 Missouri Pacific | 100 | 0 | — |
| Tex 68–3 | 27.8 | 72.2 | — |

San Augustine County (poverty population 53% black)
San Augustine
| Sunset Hills (I–A) | 100 | 0 | — |

Sabine County (poverty population 33% black)
Hemphill
| Site A | 22 | 78 | — |
| Site B | 100 | 0 | — |

Pineland
| 187–1 Knighton | 100 | 0 | — |
| 187–1 Beach | 62.5 | 37.5 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| 187–2 Denning | 100 | 0 | — |
| 187–2 Dogwood | 0 | 100 | — |
| 187–2 Cherry | 0 | 100 | — |
| 187–3 | 0 | 100 | — |

**Shelby County** (poverty population 40% black)
Center
Union Acre Trust (221(D)(3)

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Rent Supp.) | 96.9 | 3.1 | — |

Tenehana

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Tex 262–1 A | 100 | 0 | — |
| Tex 262–1 B | 0 | 100 | — |
| Tex 262–1 C | 0 | 100 | — |
| Tex 24 R000–001 § 8 New #1 | 44 | 56 | — |
| Tex 24 R000–001 § 8 New #2 | 12 | 82 | 6 |

Timpson

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Site A | 5 | 95 | — |
| Site B | 0 | 100 | — |

**Smith County** (poverty population 49% black)
Tyler

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Tyler Square § 8 New | 30.9 | 69.1 | — |
| William Booth Garden | 2.3 | 97.1 | — |
| Liberty Arms (I–A) | 100 | 0 | — |
| Texas College Garden | 100 | 0 | — |
| Village East (I–A) | 100 | 0 | — |
| Casa Granda (I) | 6.3 | 93.7 | — |
| 1717 Shiloh (I) | 6.5 | 93.5 | — |
| The Seasons | 0 | 100 | — |
| Hearthstone Nursing Home | 1 | 99 | — |
| Mel-Rose Convalescent | 92.8 | 7.2 | — |
| 112–350–67–PM | 100 | 0 | — |

Troup

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Liberty Plaza | 89.5 | 10.5 | — |

**Titus County** (poverty population 31% black)
Mt. Pleasant

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Capers | 32.4 | 67.6 | — |
| Stark | 4.7 | 95.3 | — |

Talco

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| 1 Site | 0 | 100 | — |

**Tyler County** (poverty population 28% black)
Woodville

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| 225–1 Pecan | 0 | 100 | — |
| 225–1 Elm | 0 | 100 | — |
| 225–1 Shivers | 100 | 0 | — |

**Upshur County** (poverty population 38% black)
Big Sandy

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Site A | 12 | 88 | — |
| Site I | 44 | 56 | — |

Gilmer

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| Tex 71–1 | 0 | 100 | — |
| Tex 71–2 | 100 | 0 | — |

| | Percentage Black | Percentage White | Percentage Hispanic |
|---|---|---|---|
| **Van Zandt County** (poverty population 8% black) | | | |
| Edgewood | | | |
| Site B | 0 | 100 | — |
| Site C | 0 | 100 | — |
| Site E | 31.3 | 43.7 | 25 |
| Site F | 0 | 100 | — |
| Fruitvale | | | |
| 1 Site | 0 | 100 | — |
| Grand Saline | | | |
| 1 Site | 0 | 100 | — |
| Van | | | |
| 1 Site | 0 | 100 | — |
| Wills Point | | | |
| Site 1 | 0 | 100 | — |
| Site 2 | 100 | 0 | — |
| **Wood County** (poverty population 16% black) | | | |
| Alba | | | |
| 1 Site | 0 | 100 | — |
| Winnsboro | | | |
| Elderly | 0 | 100 | — |
| Regular | 20 | 80 | — |