**Lucille YOUNG, et al., Plaintiffs,**

**v.**

**Samuel R. PIERCE, et al., Defendants.**

**Civ. A. No. P–80–8–CA.**

United States District Court,
E.D. Texas,
Paris Division.

March 3, 1988.

---

Jonathan Strong, HUD, Washington, D.C., Charlene Berry, HUD, Ft. Worth, Tex., Edward B. Cloutman, III, Mullinax, Wells, Baab & Cloutman, Dallas, Tex., Elizabeth K. Julian, Executive Director, North Central Texas Legal Services Foundation, Inc., Michael M. Daniel, Dallas, Tex., for plaintiffs.

Steven M. Mason, Asst. U.S. Atty., Tyler, Tex., Arthur R. Goldberg, David M. Souders, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### I. *Introduction.*

The above-captioned class action against the U.S. Department of Housing and Urban Development is eight years old. It is un-necessary here to recapitulate its procedural history at length, for that already has been done on numerous occasions. *See Young v. Pierce,* 822 F.2d 1368, 1369–74 (5th Cir.1987); *Young v. Pierce,* 640 F.Supp. 1476, 1479–81 (E.D.Tex.1986); *Young v. Pierce,* 628 F.Supp. 1037, 1040–41 (E.D.Tex.1985); *Young v. Pierce,* 544 F.Supp. 1010, 1012–14 (E.D.Tex.1982).

Before the court are two issues. First, a new interim injunction must be entered. It must govern, during this phase of the litigation, the conduct of the defendant United States Department of Housing and Urban Development (HUD), which has been found liable for knowing violations of the constitutional and statutory rights of the plaintiff class members. 628 F.Supp. 1037. The new injunction, filed herewith, directs HUD to take specific measures to remove the conditions that caused injury to the plaintiffs.

Second, the powers and the duties of the court's special master, properly appointed pursuant to Fed.R.Civ.P. 53, must be redefined in light of the new injunction. A separate order, filed today, delineates the master's role in this litigation.

These questions come before the court upon remand from the U.S. Court of Appeals for the Fifth Circuit, occasioned principally by the parties' stipulated settlement of a disagreement over the identity of the certified plaintiff class. *See* 822 F.2d at 1373, 1375–76. Here, the court will not give a lengthy recital of its reasons for deciding to enter an interim injunction in the first place, or for its appointment of a special master. That has been done in an earlier order, and the condition of this case on remand does not warrant repudiation of those initial decisions. *See* 640 F.Supp. at 1481–83, 1484–88. Instead, this opinion explains today's specific modifications of those earlier orders in light of the events leading to the remand.

### II. *The Effect of the Narrowed Definition of the Plaintiff Class.*

It is appropriate first to examine the nature and impact of the most significant recent development in this action, the

parties' settlement of the issue of class membership.

On the eve of appellate oral argument, the parties reached an agreement, which the Court of Appeals approved. It states in pertinent part:

1) The parties agree to restrict the [plaintiff] class certified in the above-captioned case to applicants to and residents of traditional low-rent public housing owned by public housing authorities in the thirty-six East Texas counties.

2) This agreement shall not be construed to foreclose any argument opposing or supporting use of other HUD-assisted housing as a remedy for the class certified in paragraph #1. [...]

Joint Agreement Circumscribing Class and Leaving Open Question of Remedy, *quoted in* 822 F.2d at 1373.

"Traditional low-rent public housing," as the phrase is used in the Joint Agreement, embraces dwellings owned by local public housing authorities (PHAs), and subsidized by HUD under the 1937 Housing Act, as amended, 42 U.S.C. §§ 1437 *et seq.* PHAs are political entities that initially must be approved by a local government authority before they are eligible to receive money from HUD. A precondition to a PHA's receipt of HUD funding is the PHA's continuing compliance with the objectives of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d *et seq.* One of the means by which such compliance is determined is the PHA's compulsory adoption of certain nondiscriminatory tenant-selection and tenant-assignment plans, and of various desegregative building-site selection guidelines. HUD devises these plans and guidelines. *See* 24 C.F.R. § 960.203; 24 C.F.R. § 1.4(b)(2)(ii). HUD will not support a PHA project unless it approves the specifics of the PHA's plans. *See* 24 C.F.R. §§ 200.600 *et seq.*, 941.202(b). *See generally* 544 F.Supp. at 1027. Accordingly, the stipulated plaintiff class consists of and is limited to people who occupy, or who have applied to occupy, PHA housing projects of this type in East Texas. They remain the direct victims of HUD's adjudged wrongful conduct. HUD has knowingly and pur-

posefully violated their rights under the Fifth Amendment of the United States Constitution, the 1866 Civil Rights Act, Title VI of the 1964 Civil Rights Act, and Title VIII of the 1968 Civil Rights Act (also called the Fair Housing Act). HUD's violations consist in both its funding and support of segregated low-rent public housing in thirty-six counties in East Texas, and its failure to discharge its duty to ameliorate this condition. *See* 628 F.Supp. 1037.

It is important to clarify what the narrowed definition of the plaintiff class does, and what it does not do. While it does serve to sharpen the description of the persons injured by HUD's purposeful conduct, it does not limit the court's equitable powers to fashion relief that is reasonably tailored to remedy their injuries. The redefinition of the plaintiff class merely focuses attention on the means by which HUD committed the offense. It does not disqualify the use of other implements to repair the damage that has been done. The principles of equity, not the defendant's choice of weapons, determine what remedial resources properly can be mobilized.

### III. *The Interim Injunction.*

Through its financial support and administrative oversight, HUD is involved in virtually all aspects of low-income housing in East Texas. It is not liable for discrimination in the Section 8 and rent-supplement programs. However, this does not diminish HUD's responsibility to use all of its available powers to rectify the discrimination that it is found to have created.

For example, HUD funds Section 8 projects in the thirty-six class action counties under the 1974 Housing and Community Development Act, 42 U.S.C. § 1437f. Much of HUD's Section 8 money is channeled through the local PHAs to private-sector housing providers, and many PHAs serve as Section 8 providers themselves. Under the "Existing Housing" program, HUD makes an annual contribution to a local PHA, which in turn passes the funds on to Section 8 landlords in the form of rent subsidies for low-income tenants. The landlord's contract to provide housing is with the PHA, not HUD. *See* 24 C.F.R.

Part 882. However, when a PHA serves as a conduit for "Existing Housing" money, it first must submit an equal opportunity housing plan to HUD. 544 F.Supp. at 1027–28; 24 C.F.R. § 882.204(b)(1). Under another Section 8 activity, the "New Construction/Substantially Rehabilitated Units" program, HUD pays PHAs or private housing providers to create new low-income housing. The law requires HUD to attach a number of equal-opportunity strings to money disbursed under this program, as well. *See* 24 C.F.R. § 882.111. For example, new projects cannot be located where they will redound in an increased concentration of a predominantly minority population. Moreover, the provider—whether a PHA or a private contractor—must observe nondiscriminatory guidelines in tenant assignment and placement. *See* 544 F.Supp. at 1028; 24 C.F.R. §§ 1.4(a)—(b), 881.603, 882.111, 900.103(f).

HUD also subsidizes so-called rent-supplement units, which the PHAs do not own. The rent-supplement program continues vestigially under existing contracts between HUD and unit owners, although HUD stopped awarding new contracts more than a decade ago. Rent-supplement landlords receive HUD money pursuant to the 1965 Housing and Urban Development Act, 12 U.S.C. § 1701s. Like their counterparts in the PHAs, they are required by law to observe HUD antidiscrimination guidelines and engage in HUD-approved affirmative marketing programs. *See* 544 F.Supp. at 1027; 24 C.F.R. §§ 1.4(a)—(b), 200.600 *et seq.* Furthermore, like the PHA, the rent-supplement provider must secure approval from a local government authority before it receives any money directly from HUD. 24 C.F.R. § 215.15(c)(2).

The extent of HUD's involvement in public housing in East Texas is clear. Where HUD does not work in partnership with the PHAs, it acts directly with a private-sector provider. As a matter of law, HUD has both the power and the duty to prevent segregation in the operation of all three of the programs mentioned, not just the "traditional" program.

Nevertheless, in proposing interim relief, HUD suggests that the court "ought to focus on benefitting the class of public housing applicants and residents." Memorandum in Support of Defendant's Proposed Interim Injunction, at 7. HUD argues that, because of the narrowing of the class, it should not be enjoined to perform specific acts outside the traditional low-rent public housing projects. What HUD in fact proposes is not a "focus," but instead a curtailment, of remedial efforts. It is true that the plaintiffs sustained their injuries by virtue of their relationship to the traditional PHA housing projects. But it is insufficient to order that the remedies be restricted to the scene of these violations. Instead, HUD should use all available powers to ameliorate the situation that it knowingly created. It falls to the court to marshal these powers.

To date, HUD's voluntary compliance efforts have been unsatisfactory. In more than two years since the liability finding in this action, five PHA sites, formerly racially mixed, have regressed to single-race status. *See* Status Report on Defendant's Compliance Activities, at 4 (Sept. 22, 1987). Four *new* PHA-operated sites were either completely or predominantly one-race projects.[1] Thirty-two PHAs continue to have 100% one-race sites.[2] In addition to the PHAs already mentioned, fourteen con-

---

1. These PHA projects are as follow: Bowie (100% white), Atlanta (100% black), Center (85.5% white), Mineola (78.9% white).

2. Within this category fall the following PHAs:

| | | | |
|---|---|---|---|
| Maud | Crockett | Garrison | Big Sandy |
| New Boston | Blossom | Orange | Edgewood |
| Texarkana | Como | Avery | Fruitville |
| Hughes Springs | Cumby | Bogota | Grand Saline |
| Linden | Deport | Henderson | Van |
| Alto | Cleveland | Pineland | Wills Point |
| Gladewater | Naples | Tenaha | Alba |
| Trinidad | Omaha | Woodville | Overton |

tinue to operate predominantly one-race sites.[3]

The district court is empowered to "order such affirmative action as may be appropriate" to rectify the effects of discriminatory housing practices. 42 U.S.C. § 3610(d); *see also* 42 U.S.C. § 3612(c). Where a knowing violation of the Fair Housing Act has occurred, such relief "should be structured to achieve the twin goals of assuring that the Act is not violated in the future and removing any lingering effects of past discrimination." *Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir.1983), *citing United States v. Jamestown Center-in-the-Grove Apartments*, 557 F.2d 1079 (5th Cir.1977). *See also Gore v. Turner*, 563 F.2d 159, 165 (5th Cir.1977), and cases cited therein; *United States v. West Peachtree Tenth Corporation*, 437 F.2d 221, 228 (5th Cir.1971). In order to fulfill responsibilities pressed upon it by the Constitution and federal civil rights laws, the court necessarily must have a free hand to devise broad and flexible remedies, and these remedies must be tailored to the peculiar factors of the case. *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Thus, the propriety and form of injunctive relief in housing discrimination cases is committed to the discretion of the district court, which is most familiar with the facts. *Jamestown, supra*, at 1080; *Gore, supra*, at 165.

The adjudged injury, for which equitable relief is to be fashioned, must be viewed as something that occurred within a web of circumstances. The court's task is to extirpate the unlawful conditions that have victimized—and continue to victimize—the plaintiffs. To the extent that tenant selection and assignment procedures in low-rent projects have contributed to the past injuries, and will inflict similar injuries in the future, they must be changed. HUD proposes to exempt from the reach of an injunction some low-income projects that are currently in substantial compliance. But the record of HUD's voluntary compliance efforts show that such an exemption would be premature. The backsliding that has occurred reveals the lack of wisdom in committing any remedies solely to HUD's judgment and discretion at this point in the case. Accordingly, the detailed program of tenant assignment and referral, spelled out in today's interim injunction, specifies the concrete steps to be taken with respect to discriminatory tenant selection in all the low-rent projects.

The principal feature of the new interim injunction is the court's direction that HUD implement an affirmative action tenant-assignment program for all the traditional low-rent projects within its control. This remedy specifically addresses HUD's liability, under Title VI, for failing to take steps to rectify past segregation, and it seeks to prevent ongoing segregation in the low-rent projects. *See* 628 F.Supp. at 1045–47. HUD has been far from successful in the unguided use of its powers under 24 C.F.R. § 1.4(b)(2)(iii) to compel its PHA clients to implement appropriate tenant selection and assignment plans. Paragraph 2 of today's injunction is drafted to provide the necessary specific guidance.

However, it would be impractical and counterproductive to limit relief to the operation of the traditional low-rent programs. Indeed, to do so would be to erect an "arbitrary and mechanical shield for those found to have engaged in unconstitutional conduct." *Hills v. Gautreaux*, 425 U.S. 284, 300, 96 S.Ct. 1538, 1547, 47 L.Ed. 2d 792 (1976). Although the court makes no finding of liability in this respect, it has been presented with evidence of discrimination in the Section 8 and rent-supplement tenant selections. *See, e.g.*, 628 F.Supp. at 1044. In fashioning interim relief, the court cannot turn a blind eye to these conditions.[4] Absent additional orders respect-

---

**3.** These PHAs include:

| | | |
|---|---|---|
| Diboll | Kirbyville | Dayton |
| Huntington | Beaumont | San Augustine |
| Mount Vernon | Port Arthur | Newton |
| Malakoff | Paris | Beckville |
| Grapeland | Jefferson | |

**4.** Specifically, ninety-three percent of the rent-supplement projects were predominantly one-race sites in 1985. 628 F.Supp. at 1044. So were seventy-seven percent of the Section 8 sites. *Id.* However, the statistics are more tell-

ing the Section 8 and rent-supplement units, a "flight" situation is foreseeable, wherein applicants will take themselves off the waiting lists for traditional low-rent units, and seek housing in racially imbalanced nontraditional projects, which are also funded by HUD. To limit affirmative relief to the operation of the traditional low-rent projects, as HUD has proposed, would be tantamount to sealing off these projects and preserving the *status quo ante*. Whites could take themselves out of the applicant pool if assigned to predominantly black projects; then they could apply for HUD's predominantly white Section 8 housing. Similarly, the black population could be shifted or directed to HUD's predominantly black rent-supplement units. In such a situation, desegregation of the low-rent projects would creep along with imperceptible results, where pre-existing conditions do not prevail entirely. HUD's proposed half-measures would render the relief phase of this action a Sisyphean exercise in futility. Today's injunction therefore largely adopts the substance of the plaintiffs' proposed order.

"A court of equity ought to do justice completely, and not by halves." *Camp v. Boyd*, 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913). In effect, the court is faced here with the choice of entering broad relief, or none at all. If any meaningful equity is to be done, today's injunction necessarily must reach the other low-income public housing units under HUD's control. HUD's constitutional violations permit the court to use "all reasonable methods available [to HUD] to formulate an effective remedy." *Gautreaux, supra*, 425 U.S. at 297, 96 S.Ct. at 1546, *quoting North Carolina State Board of Education v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

This case is a class action affecting the constitutional rights of numerous citizens, and the adjudged unlawful conduct of the United States government. Expansive relief therefore is appropriate here. To borrow the words of a recent opinion of the United States Court of Appeals for the Fifth Circuit, it should be pointed out that

> [u]nless otherwise provided by statute, all the inherent powers of the District Court are available for the proper and complete exercise of equitable jurisdiction. *And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character* than when only a private controversy is at stake.

*Federal Savings & Loan Insurance Corporation v. Dixon*, 835 F.2d 554, 562 (5th Cir.1987) (Jolly, J.), *quoting Porter v. Warner Holding Company*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946) (emphasis added by Judge Jolly). Thus, the facts of this case not only permit, but also constrain, the court to order changes affecting the operations of Section 8 and rent-supplement programs in East Texas.

An additional consideration informs today's decision to extend equitable remedies beyond the traditional PHA projects. Narrower relief would not only severely reduce the effectiveness of a remedial injunction; it likely would also create or aggravate discriminatory conditions in the Section 8 and rent-supplement programs in the thirty-six counties. A population "flight" from the low-rent projects would not only thwart desegregation efforts; it also likely would intensify racial imbalances in HUD's other programs, with whites going to the predominantly white Section 8 units, and blacks going to the predominantly black rent-supplement programs. Evidence of the impact of HUD's practices outside the affected projects must be considered. *Gautreaux, supra*, 425 U.S. at 291–92, 96 S.Ct. at 1543–44. The court will not, in the name of abolishing the dual system of housing in the traditional projects, worsen the racial conditions of the uninvolved inhabitants of Section 8 and rent-supplement units.

---

ing when viewed in another way. Seventy-seven percent of the old rent-supplement units were occupied by blacks, while seventy-six percent of the newer Section 8 units were occupied by whites. *Id.*

As noted above, today's specific interim remedies must lead to the elimination past and current injuries, and also prevent future unlawful conditions. This court has the "broad power to restrain acts which [it] has found to have been committed, or whose commission in the future, unless enjoined, may fairly be anticipated from the defendants' conduct in the past." *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U.S. 100, 132, 89 S.Ct. 1562, 1581, 23 L.Ed.2d 129 (1968), *quoting National Labor Relations Board v. Express Publishing Company*, 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). No matter how the activity ordered today is characterized, the interim injunction is directed solely to HUD, whose constitutional violations form the "necessary predicate" for the remedies formulated. *Gautreaux, supra*, 425 U.S. at 297, 96 S.Ct. at 1546. It commands HUD to act, by itself or within its continuing relationships with the PHAs, to bring its conduct into conformity with the law. At the same time, the injunction does not coerce "uninvolved governmental units" to do anything. *Gautreaux, supra*, at 297, 96 S.Ct. at 1547 (1976). It does not alter the constitutional, statutory, or regulatory ground rules that long have governed—or, at least, should have governed—HUD's relationships with its clients. Nor does it force unwilling local governments, PHAs, or others, to apply for, or continue to receive, HUD assistance. Instead, today's injunction "employ[s] methods 'to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation.'" *Gautreaux, supra*, at 297, 96 S.Ct. at 1546, *quoting Davis v. School Commissioners of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). If it can be said that it "compels" HUD's clients to take action, the injunction nevertheless represents a proper exercise of this court's power under Fed.R. Civ.P. 65(d), which is

> derived from the common law doctrine that … defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they are not parties to the original proceeding.

*Regal Knitwear Company v. National Labor Relations Board*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945).

Today's injunction orders HUD to use its power, authority, and discretion in a manner consistent with, and supportive of, established federal housing policy. It has the same effect on HUD and the PHAs as a discretionary decision by the defendant to provide the plaintiffs with "alternatives to the racially segregated … public housing system created by [them]." *Gautreaux, supra*, 425 U.S. at 306, 96 S.Ct. at 1550. On the other hand, as discussed above, failure to gather the Section 8 and rent-supplement operations into the ambit of an injunction would have the effect of nullifying any relief to which the traditional low-rent projects' applicants and occupants are entitled, and would likely force inequitable conditions on the uninvolved.

Accordingly, paragraphs 4 and 5 of the interim injunction mandate HUD ·to use "nontraditional" programs under the HUD's control. Paragraph 4 provides for the elective transfers of public housing applicants and residents between the traditional projects and other forms of housing, in a manner that will not perpetuate or exacerbate discrimination in any of HUD's existing programs. Paragraph 5 orders HUD to refer certain members of the plaintiff class to non-PHA projects where appropriate, and paragraphs 12 and 13 direct that, in the administration of Section 8 programs, this affirmative relief be taken into account. It is to be noted that HUD already requires non-PHA providers affirmatively to recruit HUD referrals. *See* 24 C.F.R. § 200.620(d). The information-gathering provisions of paragraph 5 command HUD to use its authority under 24 C.F.R. §§ 1.6(b)—(c) to monitor Title VI compliance.

■ It should be noted that HUD clearly has the authority to review, and require amendment to, the Affirmative Fair Housing Market Plans of non-PHA programs. Additionally, the preferential tenant selection provisions of paragraph 5 are not inconsistent with the terms of pre-existing agreements entered into between HUD and

non-PHA owners. *See* HUD Handbook 44350.3, Occupancy Requirements of Subsidized Multifamily Housing Programs, at § 3–11.

The more general language of paragraph 3 is designed to enable HUD to make a maximum contribution to the crafting of final relief in this action. HUD is directed to use its experience and expertise to the benefit of all parties, the master, and the court, in developing effective and lasting remedies for the plaintiffs' injuries, and preventing future injuries.

The information-gathering provisions of paragraphs 7, 8, 9, 10, 12, 13, and 14 make explicit HUD's obligations to monitor Title VI compliance. Their purpose is to eliminate a principal cause of injuries to the plaintiff class, namely, HUD's avowed ignorance of discrimination in public housing in the thirty-six counties. *See* 628 F.Supp. at 1054–55. Additionally, these provisions assist the court and the special master in monitoring compliance with the totality of the remedial plan. The directions in paragraph 11, regarding Comprehensive Improvement Assistance Program funding priorities, are necessary to promote the abolition of any lingering physical effects of a dual system of housing in the PHA projects. Affirmative placement into formerly black projects should not be allowed to work a hardship on white applicants. Moreover, voluntary integrative transfers should be encouraged by improving the quality of less desirable projects. The provisions regarding the use of Section 8 voucher programs are consistent with the general policy embodied in today's injunction, which is that all of the defendants' resources should be mobilized to redress the continuing injuries for which it is liable.

In summary, the new and more limited definition of the plaintiff class defines merely *where* the plaintiffs'· rights were violated; it does not deprecate the authority of the court to command the defendant to use all available and necessary means effectively to correct these violations, and to prevent future abuses. *See Gore, supra,* at 165. The contents of today's interim injunction are premised on this view.

IV. *The Special Master's Duties.*

■ A subsidiary and more technical question is the proper scope of the special master's duties and authority. Today's interim injunction spells out in detail the various obligations imposed on HUD during the next phase of this litigation. HUD's principal objection to the court's previous master's order had been the asserted impropriety of vesting, in one special master, powers both to investigate HUD's activities, and to monitor HUD's compliance with the vacated injunction. *See* 822 F.2d at 1368. It now must be determined, in light of today's new injunction, whether the master can properly be given these dual functions.

Within the guidelines of the new interim injunction, the perceived distinction, between the master's investigating and monitoring duties, is purely formalistic. There is no contradiction between these two roles. In setting out the master's responsibilities, the court principally is guided by its experiences in *Ruiz v. Estelle,* Civil Action No. H–78–987 (S.D.Tex.). In that case, as here, the court ordered the implementation of a detailed interim program for the elimination of statewide constitutional abuses in the Texas prison system. Implementation of that plan was, and continues to be, a long and complicated process requiring close and careful supervision. Accordingly, the *Ruiz* master was given "complete access" to prison's facilities and information, in order to monitor the prison system's compliance with the court-ordered remedial plan. Because of his unique vantage point, the master also was directed to recommend modifications of the court's outstanding orders, and also the form of final decrees in the case, in light of the conditions that he observed. *See, e.g., Ruiz v. Estelle,* 503 F.Supp. 1265, 1389–90 (S.D.Tex.1980); *see also Ruiz v. Estelle,* 679 F.2d 1115, 1160 n. 234 (5th Cir.1982), *modified on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

Fed.R.Civ.P. 53(b) permits reference to a master when the issues presented are "complicated." In this action, the relief

ordered is directed at a large number of low-income housing projects operating under HUD's aegis, spread over thirty-six counties. Today's injunction contemplates the use of other HUD programs to remedy HUD's unlawful conduct toward a district-wide plaintiff class. In light of the inherently complex economic, demographic, and logistical factors present in this case, as well as the intricacy and interdependence of the provisions set forth in today's remedial orders, the appointment of a master to supervise compliance is essential.

The reasons for which the special master had been appointed initially are no less relevant now. *See* 640 F.Supp. at 1485–88. Because of the strong possibility that desegregation of low-rent public housing projects will create or exacerbate injurious conditions in other housing programs, the court looks beyond the PHA projects in ordering relief. The implementation of the court's remedial orders will require a close and continuing inspection both of the statistical aspects of the problem, and of the actual physical conditions associated with desegregation. Therefore, the special master's role continues to be indispensable to the efficient resolution of this litigation.

The purpose of the interim injunction is to undertake relief tailored to the peculiar injuries and problems of this case. Necessarily, these initial remedial efforts are *ad hoc* in nature. The investigatory role of the master will be of benefit to the parties and the court in fine-tuning these measures, correcting them where necessary, and developing final relief.

The directions contained in the interim injunction are necessitated by HUD's unsatisfactory progress in voluntary remedial compliance. However, it cannot be pretended that the injunction adequately and finally addresses all aspects of the problem. The master is given investigative and monitoring responsibilities in the hope that the parties, together with the court acting through the master, can develop a final workable plan that will eliminate the widespread discrimination that has been found. In today's injunction and order, sufficient opportunity is created for HUD to devise, propose, and act on any of its own plans that will provide fair housing to the plaintiffs. HUD can develop, in close consultation with the master, any proposed interim modifications—as well as final relief—that will redress plaintiffs' injuries, avoid future injuries to plaintiffs and others, and not oppress the defendants.

A final matter is HUD's objections to giving the master the apparent power to collect information and review documents that are privileged or otherwise protected from disclosure. These objections are meritorious, and they are incorporated into today's master's order. However, in light of the nature of today's interim injunction, the court in other respects will continue to rely on the Fifth Circuit authority under which it had issued its earlier vacated order of reference.

### V. *Conclusion.*

A final word is necessary. The form of today's interim injunction responds to the unfavorable progress of remedial efforts to date, the appellate court's direction that the interim remedies be tailored with greater specificity, and this court's obligation to fashion relief responsibly, so that uninvolved citizens will not be harmed in the redressing of the plaintiffs' injuries. The interim injunction and the master's order leave room for flexibility and further modification of the court's orders, because in cases of this nature, the efficacy of various remedies only can be tested in practice.

The court has the clear duty to do equity in this action. It is acknowledged that the court's familiarity with the facts of this case does not endow it with clairvoyant powers. Necessarily, it is dealing in the abstract, at least to some degree. Some of the provisions ordered today may prove to be ineffective. Nevertheless, the court is faced with the defendant's proven liability and the plaintiffs' proven injuries. It cannot evade its obligation to devise, and to undertake, an interim plan that appears to be the most practical, according to the facts presented.